ROBERT SUMMERVILLE *v.* WARDEN, STATE PRISON
(10114)

DUPONT, C. J., FOTI and FREEDMAN, Js.

Argued May 7—decision released September 15, 1992

*Paula Mangini Montonye,* deputy assistant public defender, for the appellant (petitioner).

*Judith Rossi,* assistant state's attorney, with whom, on the brief, were *Eugene J. Callahan,* state's attorney, and *David I. Cohen,* assistant state's attorney, for the appellee (respondent).

DUPONT, C. J. The petitioner was convicted, after a jury trial, of the crime of manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (1).[1] The conviction was upheld by this court. *State* v. *Summerville,* 13 Conn. App. 175, 535 A.2d 818 (1988). The petitioner subsequently filed a petition for a writ of habeas corpus alleging (1) that his trial counsel rendered ineffective assistance and (2) that his conviction was based on unreliable medical evidence. After a hearing, the habeas court denied his petition and certified its decision for review by this court. We affirm the judgment of the habeas court regarding the ineffective assistance of counsel claim and reverse its judgment regarding the unreliable evidence claim.

The following facts from the petitioner's trial are relevant to the issues in the present appeal. On October 12, 1985, the petitioner and the victim, who had been friends for several years, met in a bar in Bridgeport. The victim invited the petitioner to attend a party in Stamford later that evening. Instead of attending the party, the two checked into a hotel room in Stamford

---

[1] The defendant was also convicted of the crime of possession of cocaine. He does not challenge that conviction in this habeas corpus proceeding.

at approximately 11:30 p.m. that evening. Both the victim and the petitioner remained in the room for several hours drinking, socializing, and ingesting cocaine.

At approximately 5:30 a.m. the following morning, the petitioner summoned a security guard to the room claiming that the victim had suffered a stroke. When the security guard entered the room, he observed the victim on the floor partially covered by a bed sheet. He checked for a pulse but found none. The security guard called the police for assistance. An emergency medical technician responded to the scene shortly thereafter. Upon finding no pulse, he began efforts to resuscitate the victim. Resuscitation efforts continued until the victim arrived at Stamford Hospital, but the victim never responded and was pronounced dead.

At trial, the state produced Arkady Katsnelson, an associate chief medical examiner, who testified that the victim died as a result of manual strangulation. Katsnelson based his conclusion on the following observations made during the autopsy process: (1) a semi-lunar abrasion on the victim's neck below the left ear that seemed to have been caused by a fingernail; (2) multiple petechial, or pinpoint, hemorrhages in the left eye and on the heart and lungs; (3) hemorrhages in the muscles on the left side of the neck; and (4) separation of the victim's hyoid bone, a U-shaped bone deep inside the neck, with evidence of hemorrhage at the place of separation. Katsnelson observed further injuries to the vocal chords and laryngeal area that he concluded could have been caused by intubation during resuscitation efforts. Katsnelson also testified that cocaine was present in the victim's blood and nose. Although the victim had a potentially fatal level of cocaine in her blood at the time of death, Katsnelson ruled out death by cocaine intoxication in light of the evidence pointing to manual strangulation.

The petitioner relied on the testimony of Elliot Gross, then the chief medical examiner for the city of New York and formerly the chief medical examiner in Connecticut, to support his theory that the victim died of cocaine intoxication. Gross indicated that after reading Katsnelson's autopsy report, he had questions about its findings in part because of the lack of external injuries to the victim's face and neck. After reviewing the various records and examining the larynx, tongue and hyoid bone, which were made available to him through the chief medical examiner's office, Gross testified as follows regarding Katsnelson's findings and conclusion: (1) the single abrasion on the left side of the victim's neck, which he agreed was semi-lunar in shape, although consistent with manual strangulation, was also consistent with resuscitation efforts and therefore was an insufficient basis for a conclusion of manual strangulation; (2) he was unable to conclude that the hemorrhage in the left eye was petechial, and he explained that, although petechial hemorrhages to the eyes, lungs, and heart are consistent with death by manual strangulation, they are indicators of an asphyxial death, that is, any death caused by the lack of oxygen to the brain, including seizure or convulsion, which can be caused by excessive cocaine ingestion; (3) the hemorrhages found in the neck muscles were near a puncture wound caused by the insertion of an intravenous line on the victim's left side and could have been an extension of the hemorrhage that resulted from that trauma as opposed to any injury to the neck muscles caused by strangulation; (4) although separation of the hyoid bone can occur as a result of manual strangulation or intubation during resuscitation or removal during the autopsy, he concluded that the separation of the hyoid bone in this case occurred during the autopsy, that is, it was an artifact of the dissection process, because he did not see extensive hemorrhages in the

area of the separation and because another portion of the hyoid bone had been cut off by Katsnelson during the removal process. Gross, as did Katsnelson, testified that the hemorrhages in the laryngeal area were not petechial and were likely caused by intubation, the insertion of a tube into the breathing passages during resuscitation efforts. Gross also testified that the victim had a fatal level of cocaine in her blood at the time of death and that excessive levels of cocaine can cause convulsions and anoxia. Although Gross admitted that he could not exclude the possibility of manual strangulation based on each piece of evidence relied on by the state, he maintained the opinion that taken together the evidence was not sufficient to enable him to conclude that the victim died by strangulation. In light of the evidence of cocaine intoxication and, in his view, the inconclusive evidence of manual strangulation, Gross concluded that the cause of death was cocaine intoxication.

On cross-examination, Gross conceded that microscopic slides of the areas of the hemorrhaging could help determine if the injuries had occurred before death, but that he did not order such slides. While hemorrhaging will most often occur only in injuries inflicted before death, Gross noted that hemorrhaging can also appear in injuries caused within a short time after breathing has stopped.

The state then called William Q. Sturner, chief medical examiner for the state of Rhode Island, as a rebuttal witness. Sturner testified that the injuries in the laryngeal area were not caused by intubation and therefore were inconsistent with resuscitation. He based this testimony in part on his examination of microscopic slides made from the area of hemorrhaging, the same type of slides that Gross did not order. By examining the slides, Sturner claimed to be able to determine that the hemorrhages occurred before the victim stopped

breathing and, therefore, in his opinion, were not the result of resuscitation efforts. Sturner examined slides of the tissue at the separation in the hyoid bone but was unable to render any opinion as to whether the separation was caused before the death of the victim. Sturner also testified that the hemorrhaging in the neck muscles was not caused by intubation or the insertion of the central intravenous line which was placed on the other side of the victim's neck by hospital personnel. In this regard, Sturner noted that hospital records showed that a "practice" line was put into the left side of the victim's neck by hospital staff very soon after she was pronounced dead. Sturner further testified that the semi-lunar abrasion on the victim's neck was caused by a fingernail before the victim died and not during resuscitation efforts. On the basis of the factors observed by him, including information gathered from his review of the slides, Sturner concluded the cause of death was not cocaine intoxication.

At trial, defense counsel objected to Sturner's testimony on the grounds that it was not appropriate rebuttal testimony and that the use of the slides by the state constituted unfair surprise. The state offered defense counsel a continuance in order to examine the slides. The petitioner's trial counsel, however, rejected the offer of a continuance.

On direct appeal, the petitioner challenged, inter alia, the trial court's decision to allow the rebuttal testimony of Sturner. This court concluded that Sturner's testimony was appropriate as rebuttal testimony and that it was not improperly admitted even though the slides used by Sturner were not made available to the petitioner prior to the day Sturner testified. *State* v. *Summerville*, supra, 181–84. We rejected the petitioner's argument that he was unfairly surprised by the state's use of the slides in part because the petitioner rejected the state's offer of a continuance; id., 183–84; and we

did not agree with the petitioner's claim that the evidence was insufficient to support the conviction. Id., 184–85.

The petitioner subsequently challenged his conviction in this habeas corpus proceeding. In his petition for a writ of habeas corpus, the petitioner claimed that the evidence on which his conviction rested was unreliable and that he was denied the effective assistance of counsel at his trial. The petitioner introduced evidence before the habeas court to support both claims.

The petitioner's claim of ineffective assistance of counsel focuses on the failure of his trial counsel, Stephen F. Donahue, to accept the state's offer of a continuance in order to prepare to meet Sturner's testimony regarding the slides. Richard Brown, an attorney who testified on behalf of the petitioner, stated that in his opinion Donahue's failure to have the slides examined constituted ineffective assistance of counsel. Donahue testified regarding his reasons for neither accepting the state's offer of a continuance nor requesting a continuance. Although he believed that the trial court would have agreed to a short continuance, Donahue explained that his decision to forego a continuance was based on the following factors:[2] (1) he believed that the testimony by Sturner was improper and would be a successful ground for appeal; (2) he believed that Gross had become unavailable to him because Gross was then testifying in a lengthy and highly publicized case in New York; (3) he did not know what Gross would conclude upon review of the slides; (4) he felt that the case had already been fraught with continuances requested by the defense due to limitations on Gross' availability and that another continuance could possibly agitate or alien-

---

[2] Donahue did not articulate these factors to the habeas court in the order in which we have listed them. They have been reordered to facilitate our discussion of them.

ate the jury; and (5) he believed that he had already established reasonable doubt based on Gross' testimony.

At the hearing before the habeas court, the petitioner also presented the testimony of Mark Taff, a forensic pathologist. Taff's testimony was intended to support the petitioner's claim regarding the unreliability of the medical evidence used to convict him.

Taff reviewed the same evidence examined by the experts who testified at the petitioner's trial but Taff examined photographs of the neck organs because the actual neck organs were no longer available. Taff made the following findings and conclusions: (1) the abrasion that the other experts identified as a semi-lunar abrasion on the victim's neck was actually a T-shaped abrasion located at the junction of the left jaw and the neck and was a superficial scratch that did not correspond to any significant findings beneath the skin; (2) petechial hemorrhages resulting from strangulation would not be localized to one eye but would be visible on both sides of the face; there were no petechial hemorrhages present in the victim's face but instead a larger hemorrhage was visible in the lower left eyelid along with swelling that could have been caused by a fall or collapse; the numerous petechial hemorrhages on the back wall of the heart, while consistent with manual strangulation, could also have been caused by resuscitation efforts; (3) the "hemorrhage" in the neck area appeared to be related to seepage of blood from the jugular vein due to the cutting of the vein by a scalpel during the autopsy, and, along with additional blood from the venipuncture, was therefore artifactual; there was no visible injury to the neck muscles, which is consistent with lack of injury to the surface of skin; there were hemorrhages only in the laryngeal area, which is consistent with intubation during resuscitation; while it is possible for these areas to hemorrhage due to man-

ual strangulation without evidence of trauma to the skin and the tissue below the skin and the muscles on the outside of the laryngeal area, he has never seen it and regards the lack of such trauma as inconsistent with manual strangulation; (4) the slides of the hyoid bone showed no hemorrhage in the separation of the hyoid bone, which indicates that the separation did not occur before death and was caused by the autopsy. Taff concluded that, in the absence of consistent indicators of manual strangulation and in light of the victim's toxic level of cocaine, death was caused by cocaine intoxication.

After the habeas court rejected both claims advanced by the petitioner, this appeal followed.

## I

The petitioner claims that he was denied his constitutional right to the effective assistance of counsel. He argues that his trial counsel rendered ineffective assistance by not availing himself of an offered continuance in order to have an expert examine the slides relied on by Sturner and to permit his expert to offer surrebuttal testimony. We disagree.

"Our Supreme Court has made clear that to succeed in his claim of ineffective assistance of counsel, the petitioner must show that his attorney's performance was not ' "reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law" '; *State* v. *Clark,* 170 Conn. 273, 283, 365 A.2d 1167, cert. denied, 425 U.S. 962, 96 S. Ct. 1748, 48 L. Ed. 2d 208 (1976), quoting *Gentry* v. *Warden,* 167 Conn. 639, 646, 356 A.2d 902 (1975); and that this ' "lack of competency contributed to the conviction." ' *State* v. *Clark,* supra; *Levine* v. *Manson,* 195 Conn. 636, 639, 490 A.2d 82 (1985). Furthermore, our Supreme Court has adopted the two-pronged test for ineffectiveness of counsel set forth by

the United States Supreme Court in *Strickland* v. *Washington,* 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). That test requires a conclusive showing that (1) the attorney's performance was so deficient and the errors made by counsel were so egregious that the attorney was not functioning as counsel; id., 687; and (2) there exists 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' Id., 694." *Ostalaza* v. *Warden,* 26 Conn. App. 758, 761, 603 A.2d 768, cert. denied, 222 Conn. 906, 608 A.2d 692 (1992).

The petitioner's claim of ineffective assistance of counsel for failure to seek or to accept a continuance is, at its core, a claim of ineffective assistance based on a failure to investigate facts adequately in order to prepare a proper defense. Our cases recognize that the effective assistance of counsel includes counsel's obligation to investigate the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case. *Siemon* v. *Stoughton,* 184 Conn. 547, 556 n.3, 440 A.2d 210 (1981); *Ostaloza* v. *Warden,* supra, 765. This obligation also includes a duty to seek out expert opinion and to secure the attendance of expert witnesses when the facts of the case require such investigation and evidence to support a theory of defense. See, e.g., *Rogers* v. *Israel,* 746 F.2d 1288, 1294 (7th Cir. 1984) (counsel acted unreasonably in failing to ask a qualified expert about effect of bullet wound to heart and lungs on victim's ability to engage in struggle thereafter); *Loe* v. *United States,* 545 F. Sup. 662 (E.D. Va. 1982) (failure to obtain psychiatric examination of criminal defendant to support insanity defense); *People* v. *Danley,* 758 P.2d 686 (Colo. App. 1988) (counsel ineffective in failing to investigate the availability of expert testimony regarding operability of furnaces where defendant charged with attempting to sell unneeded heating equipment after telling alleged vic-

tims that their furnaces were defective and dangerous); *Commonwealth* v. *Haggerty,* 400 Mass. 437, 509 N.E.2d 1163 (1987) (defense counsel's failure to investigate and pursue expert opinion regarding the issue of causation of victim's death was ineffective assistance of counsel).

Here, Donahue failed to investigate certain evidence brought out by the state during its presentation of rebuttal evidence. Donahue justified his decision to forego investigation and surrebuttal testimony on a combination of tactical considerations. Although our Supreme Court has stated that the "failure to conduct an adequate investigation is not a matter of trial tactics"; *Siemon* v. *Stoughton,* supra, 557; an evaluation of counsel's investigation cannot take place in a vacuum. While we will not diminish the force of the mandate that "[c]ounsel must make his decisions on an informed basis"; id.; all investigations necessarily take place against the backdrop of the eventual trial setting or, in this case, in the context of the ongoing trial. We have recently recognized that an evaluation of counsel's pretrial investigation necessarily involves some consideration of the relationship between the need for further investigation and eventual trial strategy. *Ostolaza* v. *Warden,* supra, 764–67. Here, where the claimed deficiency in counsel's performance arose not from inadequacies in his pretrial investigation but from counsel's failure to investigate facts revealed during the presentation of rebuttal evidence by the state, we are guided by the standard enunciated by the United States Supreme Court in *Strickland* v. *Washington,* supra, 690–91: "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a

particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."

We now turn to an evaluation of the strategic concerns considered by defense counsel in choosing not to accept a continuance to investigate Sturner's findings with respect to the slides. When undertaking this analysis, we will not second guess the reasonable judgment of counsel through the distorting lens of hindsight. See *Ostolaza* v. *Warden,* supra, 765.

The first three reasons articulated by Donahue for not investigating the basis of the rebuttal testimony do not represent a reasonable basis for concluding that the continuance for purposes of investigation was unnecessary. Counsel's belief that the trial court has improperly allowed adverse testimony into a case does not justify counsel's failure to respond to that evidence. Counsel does not function as counsel when abandoning the role of advocate because he believes the trial court has committed reversible error. Cf. *Commonwealth* v. *McCaskill,* 321 Pa. Super. 266, 278–79, 468 A.2d 472 (1983) (counsel may not decide not to investigate a possible defense, in the expectation that the case will not go to trial because a favorable ruling will be made on a pretrial motion, unless that decision has some reasonable basis of serving his client's interests; effective counsel will never forego investigation of all possible defenses simply because he thinks he has made a winning pretrial motion); *Smith* v. *State,* 547 N.E.2d 817, 821–22 (Ind. 1989) (counsel's failure to prepare for penalty phase of trial on the basis of his belief that verdict would be different was not a matter of strategy but constituted constitutionally deficient performance). Likewise, the fact that Gross may not have been available to testify within the time constraints likely to have been imposed by the trial court in granting a continu-

ance was not a relevant concern under the circumstances of this case. To be sure, Gross was familiar to defense counsel and the jury. Gross, however, was certainly not the only qualified expert who was able to examine the slides to determine if they contained relevant information bearing on the question of whether the injuries occurred before death. The duty to investigate cannot be made to depend on the availability of a particular expert witness not under the control of the defendant, at least where that person's field of expertise is not so unique that it is likely that there are others who could examine the disputed evidence and allow counsel to make an informed decision whether and how to counter that evidence. Finally, that Donahue did not know what his expert would conclude upon review of the evidence cannot justify a failure to seek expert opinion. To give weight to this factor in assessing the reasonableness of defense counsel's representation of the petitioner would seriously undermine counsel's duty to "make his decisions on an informed basis." *Siemon* v. *Stoughton,* supra, 557; see *Loe* v. *United States,* supra, 672 (defense counsel's "speculation as to the outcome of an expert examination should be given little credence").

It is the other factors considered by Donahue, namely, that additional delay could possibly agitate or alienate the jury and that he believed he had already established a strong case through Gross' testimony, that convince us that Donahue exercised reasonable judgment in not accepting a continuance to investigate the evidence relied on by the state in the rebuttal portion of its case. The trial proceedings were lengthy. There had already been delays caused by Gross' unavailability as a defense witness due to his involvement in a trial in New York. The state presented its case on September 24 and 26 and October 2, 1985. The defendant presented his case on October 3 and 10, and on October 18 when Gross

was able to testify. The jurors reported to the courthouse on a daily basis during the defendant's portion of the case only to be excused because of the problem with scheduling Gross' testimony. The very real concern that the jurors might become agitated by further delay in the proceedings was therefore an appropriate consideration by defense counsel when evaluating the matter of a continuance.

This is especially true where counsel reasonably believed that he had already put forth a strong case that had raised a reasonable doubt regarding the defendant's guilt. We are mindful that "[i]t is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland* v. *Washington,* supra, 689. In his testimony, Gross carefully explained how the evidence relied on by the state did not support the conclusion of death by manual strangulation. In determining whether to offer surrebuttal testimony, defense counsel appropriately considered the strength of Gross' testimony in light of Sturner's rebuttal testimony. A comparison of the testimony of Gross and Sturner shows that their divergent conclusions were not based so much on the conclusions Sturner drew from the slides but on the different interpretations each attached to the evidence of hemorrhages in the victim's neck area. Although Sturner explained that the hemorrhages he saw in the slides of the laryngeal area suggested antemortem injury, Gross opined that evidence of hemorrhaging would look the same whether caused before or shortly after death. This is not a case where the testimony that defense

counsel failed to rebut directly remained in the case unchallenged. Cf. *Commonwealth* v. *Stonehouse,* 521 Pa. 41, 65, 555 A.2d 772 (1989) ("[t]here was no reasonable basis for trial counsel not to call an expert witness to counter the erroneous battered woman myths upon which the Commonwealth built its case").

A belief that counsel already possesses evidence supporting a strong defense will not immunize counsel from an ineffective assistance claim based on a pretrial failure to investigate potentially exculpatory evidence. See *Siemon* v. *Stoughton,* supra. The investigatory duty of counsel to obtain potential surrebuttal evidence, however, is necessarily examined differently because it arises in the context of the ongoing trial proceedings. *Strickland* v. *Washington,* supra. Under the circumstances of this case, where the rebuttal evidence certainly did not completely undermine the basis of the defense expert's testimony and in light of the legitimate strategic considerations regarding the potentially adverse effect of a continuance on the jury's consideration of the case, we conclude that Donahue's failure to accept the state's offer of a continuance to investigate the slides and possibly to offer surrebuttal testimony, was an exercise of reasonable professional judgment arrived at after weighing the pros and cons. Counsel's decision therefore fell within "the amorphus zone known as 'trial strategy' or 'judgment calls' "; *Jones* v. *Estelle,* 632 F.2d 490, 492 (5th Cir. 1980), cert. denied, 451 U.S. 916, 101 S. Ct. 1992, 68 L. Ed. 2d 307 (1981); which will not be second guessed by this court.

## II

The petitioner also claims that, in light of Taff's testimony, he is entitled to habeas corpus relief on the ground that the medical evidence presented at his trial regarding the cause of death was unreliable and, as a

result, denied him a fair trial. Specifically, the petitioner claims that the additional evidence not presented at his trial undermined the reliability of the jury's determination that he caused the victim's death by manual strangulation.

The habeas court did not evaluate Taff's testimony. Instead, the court concluded that it lacked the authority to inquire into the sufficiency of the evidence or the resolution of the facts that supported the petitioner's conviction. In reaching this conclusion, the trial court relied primarily on *Perell* v. *Warden*, 113 Conn. 339, 155 A. 221 (1931), *Vena* v. *Warden*, 154 Conn. 363, 225 A.2d 802 (1966), and *McClain* v. *Manson*, 183 Conn. 418, 439 A.2d 430 (1981).

In *Perell* v. *Warden*, supra, the court concluded that a habeas corpus petitioner cannot challenge the sufficiency of the evidence supporting his conviction when he did not pursue the denial of his motion for a new trial by way of direct appeal. Recognizing that a petition for habeas corpus cannot be a substitute for a direct appeal, the conclusion of the *Perell* court represents an early application of what became the "deliberate bypass" doctrine in habeas corpus proceedings. See *McClain* v. *Manson*, supra, 433; *Vena* v. *Warden*, supra, 365. In the present case, however, the habeas court found that the petitioner did not deliberately bypass the orderly process of direct appeal inasmuch as his claims lie outside the trial record. This finding is not challenged on appeal,[3] and, consequently, the *McClain*

---

[3] Under the circumstances of this case, we need not decide whether the "deliberate bypass" standard of *Vena* v. *Warden*, 154 Conn. 363, 225 A.2d 802 (1966), or the "cause and prejudice" standard recently adopted by our Supreme Court in *Johnson* v. *Commissioner*, 218 Conn. 403, 589 A.2d 1214 (1991), or neither, is applicable in this case. Even where a procedural barrier is applicable, our Supreme Court has noted that "[t]his restrictive rule is somewhat ameliorated by a general exception that 'where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence

and *Vena* cases are inapplicable to this case. Additionally, the *Perell* holding regarding the unreviewability of sufficiency claims in habeas corpus proceedings is equally inapplicable because the petitioner is not claiming that the evidence presented at his trial, if believed by the jury, was insufficient to convict him.[4] It is beyond dispute that the petitioner's conviction was supported by sufficient evidence. *State* v. *Summerville,* supra, 184–85.

Instead, the petitioner asserts that the additional evidence, which was not presented to the jury at his trial, sufficiently undermines the conclusiveness of the fact-finding process that led to the jury's determination of his guilt so that a new trial is mandated. If this claim, that the medical evidence presented against him at trial was unreliable and therefore violated his right to a fair trial, is properly raised in a petition for a writ of habeas corpus, then we must remand the case to the habeas court for further consideration.

Our habeas corpus statute requires the habeas court to "dispose of the case as law and justice require." General Statutes § 52-470 (a). The petitioner is claiming

of showing of cause for the procedural default.' " *Valeriano* v. *Bronson,* 209 Conn. 75, 80, 546 A.2d 1380 (1988), quoting *Murray* v. *Carrier,* 477 U.S. 478, 496, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986). The petitioner's claim of unreliable evidence would fall within this exception.

[4] While we need not determine whether the *Perell* v. *Warden,* 113 Conn. 339, 155 A. 221 (1931), holding is good law, we note that in *Wojculewicz* v. *Cummings,* 143 Conn. 624, 124 A.2d 886 (1956), our Supreme Court noted that while habeas corpus cannot be utilized as a substitute for an appeal, it can be used when the judgment of conviction and sentence is the culmination of a proceeding that fails to meet the constitutional requirement of a fair trial. The right not to be convicted except upon proof beyond a reasonable doubt is one of constitutional magnitude; *In re Winship,* 397 U.S. 358, 361, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); and has been applied in federal habeas proceedings. See *Jackson* v. *Virginia,* 443 U.S. 307, 317–18, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). We see no reason why the same should not apply in a state habeas proceeding. See *Valeriano* v. *Bronson,* 209 Conn. 75, 96–98, 546 A.2d 1380 (1988) (*Shea, J.,* concurring).

that no crime was committed. Such a claim goes to the very essence of the constitutional guarantee of due process. "The principal purpose of the writ of habeas corpus is to serve as a bulwark against convictions that violate fundamental fairness. . . . To mount a successful collateral attack on his conviction a prisoner must demonstrate a miscarriage of justice or other prejudice . . . . In order to demonstrate such a fundamental unfairness or miscarriage of justice, the petitioner should be required to show that he is burdened by an unreliable conviction." (Citations omitted; internal quotation marks omitted.) *Bunkley* v. *Commissioner of Correction,* 222 Conn. 444, 460–61, 610 A.2d 598 (1992). Where new evidence undermines judicial confidence in the result reached such that it can be said that an injustice was likely done and that it is probable that a new trial would produce a different result, relief must be available through the writ of habeas corpus. Cf. *Taborsky* v. *State,* 142 Conn. 619, 116 A.2d 433 (1955); *Reilly* v. *State,* 32 Conn. Sup. 349, 355 A.2d 324 (1976).

Our Supreme Court recently recognized that "[o]ne cogent reason for overturning the verdict of a jury is that the verdict is based on conclusions that are physically impossible." *State* v. *Hammond,* 221 Conn. 264, 268, 604 A.2d 793 (1992). The evidence presented by the petitioner at the hearing before the habeas court was intended to show that the victim's death was not the result of manual strangulation, that is, that no crime was committed. The additional evidence brought forth by the petitioner, if found to be such that a jury might reasonably credit, indicates that the petitioner's conviction was based on a scientific improbability, if not an impossibility. Under the circumstances, the petitioner's claim implicates the constitutional right to a presumption of innocence and his right to a fair trial; see id., 288–89; and is therefore cognizable in a habeas corpus proceeding. "The very nature of the writ

demands that it be administered with the initiative and flexibility to insure that miscarriages of justice within its reach are surfaced and corrected." *Harris* v. *Nelson,* 394 U.S. 286, 291, 89 S. Ct. 1082, 22 L. Ed. 2d 281 (1969); *Valeriano* v. *Bronson,* 209 Conn. 75, 97, 546 A.2d 1380 (1988) (*Shea, J.,* concurring). To conclude otherwise would negate the obligation of the habeas court to "dispose of the case as law and justice requires." General Statutes § 52-470 (a).

The exculpatory evidence proffered at the habeas hearing raises a serious question of whether a jury could reasonably have concluded that the petitioner was guilty beyond a reasonable doubt had the new evidence been before it, along with the evidence already considered at trial. *State* v. *Hammond,* supra, 286–87. Because that is so, and because our jurisprudence mandates that we give effect to the presumption of innocence even in a postconviction proceeding, a remand is necessary so that Taff's testimony and the facts established and the inferences reasonably drawn therefrom can be evaluated by the habeas court. Id., 286–89. The habeas court did not examine the merits of this claim of the petitioner and might have ruled differently had these merits been explored. Id., 288–89. We must therefore remand the case to the habeas court for further consideration of the merits of the petitioner's claim that his conviction was based on unreliable medical evidence. See *Quintana* v. *Warden,* 220 Conn. 1, 593 A.2d 964 (1991); *Lozada* v. *Warden,* 24 Conn. App. 723, 591 A.2d 1272 (1991), aff'd, 223 Conn. 834, 613 A.2d 818 (1992); *Sutton* v. *Robinson,* 6 Conn. App. 518, 506 A.2d 566 (1986).

On remand, the habeas court should carefully examine the new medical evidence bearing on the issue of the cause of the victim's death in order to determine the effect the new evidence would have on a jury in rendering its verdict. This will require that the court

consider Taff's testimony in relation to the trial testimony considered by the jury, an inquiry that we do not need to undertake at this stage in the proceedings. If, after analyzing this evidence, the habeas court concludes that an injustice was done and that it is probable that a different result would be reached in a new trial, then the court must grant the writ.

The judgment is affirmed on the ineffective assistance of counsel claim; the judgment is reversed on the unreliable evidence claim and the case is remanded for further proceedings on that claim.

In this opinion the other judges concurred.