Robert Summerville *v.* Warden, State Prison
(14649)

Peters, C. J., Borden, Berdon, Norcott and Lavery, Js.

Argued October 29, 1993—decision released May 24, 1994

*Paula Mangini Montonye,* assistant public defender, for the appellant-appellee (petitioner).

*Judith Rossi,* assistant state's attorney, with whom, on the brief, were *Eugene J. Callahan,* state's attorney, and *David I. Cohen,* assistant state's attorney, for the appellee-appellant (respondent).

BORDEN, J. This certified habeas corpus appeal raises two principal issues. They are: (1) whether habeas corpus recognizes a claim of actual innocence affecting the fairness of the petitioner's criminal trial even if that claim does not depend upon an antecedent constitutional violation; and (2) whether, in the circumstances of this case, the petitioner has produced sufficient evidence to require a remand to the habeas court for a consideration of his claim of actual innocence because his conviction of manslaughter in the first

degree in violation of General Statutes § 53a-55 (a) (1)[1] had been based on unreliable medical evidence.

Pursuant to our grants of certification to appeal, the petitioner, Robert Summerville, appealed, and the respondent, the warden of the state correctional institution at Somers,[2] cross appealed from the judgment of the Appellate Court. That judgment: (1) affirmed the determination of the habeas court that the petitioner had not been denied his constitutional right to the effective assistance of counsel at his trial; and (2) reversed the judgment of the habeas court insofar as that court had not evaluated the evidence produced by the petitioner purporting to establish that his original conviction had been based on unreliable medical evidence. See *Summerville* v. *Warden*, 29 Conn. App. 162, 614 A.2d 842 (1992). With respect to the reversal, the Appellate Court remanded the case to the habeas court for a determination of the merits of the petitioner's claim.

We granted the petitioner's petition for certification to appeal, limited to the following issue: "Did the Appellate Court correctly conclude that it should not decide the issue of whether an ineffective investigation by a defense expert witness in a fashion that impairs the petitioner's defense is impugned to the defense attorney?" *Summerville* v. *Warden*, 224 Conn. 918, 617 A.2d

---

[1] General Statutes § 53a-55 provides in relevant part: "MANSLAUGHTER IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of manslaughter in the first degree when: (1) With intent to cause serious physical injury to another person, he causes the death of such person or of a third person . . . ."

The petitioner had originally been charged with murder, and the jury found him guilty of the lesser included offense of manslaughter in the first degree. See *State* v. *Summerville*, 13 Conn. App. 175, 176, 535 A.2d 818 (1988). He was also convicted of possession of cocaine. He did not challenge that conviction in his original appeal; id., 176 n.2; or in this habeas corpus proceeding.

[2] The respondent is variously referred to in the court file as "Warden, State Prison at Somers" and "Commissioner of Correction." We attribute no significance to the varying terminology.

172 (1992). We also granted the respondent's petition to appeal, limited to the following issue: "Did the Appellate Court have proper grounds for remanding this case to the habeas court for a consideration of expert testimony that was not presented at the petitioner's criminal trial?" Id.

We conclude that the petitioner's petition for certification was improvidently granted, and we therefore decline to consider the issue presented by that petition. With respect to the issue presented by the respondent's petition for certification, we agree with the Appellate Court that a claim of actual innocence of the crime of which the petitioner has been convicted is cognizable in a habeas corpus proceeding. We conclude, however, that the evidence produced by the petitioner in this case was insufficient to establish such a claim on habeas corpus, and was, therefore, insufficient to justify any remand to the habeas court for evaluation of that evidence. Accordingly, we reverse the judgment of the Appellate Court.

I

A proper understanding of our determination of the issues presented in this case requires a thorough review of the evidence produced at the petitioner's criminal trial and at the habeas proceeding, as well as the procedural history of this case. The evidence supporting the petitioner's conviction was summarized in his original appeal on the merits in the Appellate Court. "On October 12, 198[4],[3] the [petitioner] and the victim, who had been friends for several years, met in a bar in Bridgeport. The victim invited the [petitioner] to attend

---

[3] In the opinions of the Appellate Court on the petitioner's original appeal and the habeas review, this date is erroneously given as October 12, 1985. See *Summerville* v. *Warden,* supra, 29 Conn. App. 163; *State* v. *Summerville,* 13 Conn. App. 175, 176, 535 A.2d 818 (1988). The petitioner's criminal trial began with the presentation of evidence on September 24, 1985.

a party in Stamford later that evening. Instead of attending the party, the two checked into a hotel room in Stamford at approximately 11:30 p.m. that evening. Both the victim and the [petitioner] remained in the room for several hours drinking, socializing, and ingesting cocaine.

"At approximately 5:30 a.m. the following morning, the [petitioner] summoned a security guard to the room claiming that the victim had suffered a stroke. When the security guard entered the room, he observed the victim on the floor partially covered by a bed sheet. He checked for a pulse but found none. The security guard called the police for assistance. Terrance Shea, a Stamford fireman and emergency medical technician, responded to the scene shortly thereafter. Shea checked the victim's pulse and upon finding none began efforts to resuscitate the victim. Resuscitation efforts continued until the victim arrived at Stamford Hospital, but the victim never responded and was pronounced dead.

"At trial, the state produced Arkady Katsnelson, an associate chief medical examiner, who testified that the victim died as a result of manual strangulation. Katsnelson further testified that he found an abrasion on the victim's neck below the left ear which seemed to have been caused by someone's fingernail. Katsnelson also noted a separation of the victim's hyoid bone, a U-shaped bone deep inside of the neck, hemorrhages to the victim's neck, eye, heart, and lungs, and cocaine in the victim's blood and nose.

"The [petitioner] called Elliot Gross, the former chief medical examiner in Connecticut, to support his theory that the victim died of cocaine intoxication. Gross, after reviewing the records and examining the larynx, tongue and hyoid bone which were made available to him through the chief medical examiner's office, testi-

fied that the victim's injuries and hemorrhages were due to the resuscitation efforts. On cross-examination, Gross conceded that microscopic slides of the areas of hemorrhaging could determine if the injuries had occurred before or after death, but that he did not order such slides in this case.

"The state then called William Q. Sturner, chief medical examiner for the state of Rhode Island, as a rebuttal witness. Sturner rebutted Gross' opinion by testifying that the injuries he observed were inconsistent with resuscitation. He based his testimony in large part on his examination of microscopic slides made from the area of hemorrhaging, the type of slides the [petitioner's] expert chose not to order. By examining the microscopic slides of where the hemorrhaging occurred, Sturner was able to determine that the hemorrhages occurred before the victim stopped breathing, and therefore were not the result of resuscitation efforts. Sturner concluded that the death of the victim was by strangulation."[4] *State* v. *Summerville,* 13 Conn. App. 175, 176–78, 535 A.2d 818 (1988).

In addition to this evidence, the following evidence was presented to the jury at the petitioner's criminal trial. Thomas Aiello, the occupant of the adjoining hotel room, testified that shortly after 5 a.m. he had heard heavy breathing, grunting and slapping noises coming from the petitioner's room, and that he had heard a woman's voice say "stop." Aiello interpreted the sounds as those of vigorous sexual activity, but the autopsy indicated no signs of recent sexual activity, and the petitioner did not describe any sexual activity with the victim in his statements to the police.

---

[4] This last statement by the Appellate Court is inaccurate. Our examination of the trial evidence discloses that Sturner did not give an opinion of the cause of death. As a rebuttal witness, he testified only, in this regard, that in his opinion the cause of death was not cocaine intoxication, a cause of death to which Gross, as the petitioner's defense witness, had testified.

Gregory Cinque, a hotel employee who had assisted in the attempts to resuscitate the victim, testified that the victim's tongue had been protruding from her mouth. In addition, there was evidence that the bedclothes had been bloodstained, and that there had been blood under the victim's fingernails.

There was also evidence that the petitioner had summoned Irwin Osorio, the hotel security guard, to the room. He told Osorio that the victim had suffered a stroke while he and the victim had been fighting, and that he had tried to put her protruding tongue back into her mouth. The petitioner later told the police that, as the victim had gotten up from the bed to go to the bathroom, she had experienced a seizure and had fallen to the floor. He also stated to the police that the victim had choked on her tongue, and that when he had forced her jaw open and reached into her mouth to pull her tongue out, she had bitten his hands. The police observed marks or scratches on the backs of the petitioner's hands and fingers, but the physician who treated him at the hospital emergency room observed no wounds on his palms.

Katsnelson performed the autopsy on the victim. His initial external examination of the body disclosed certain marks and hemorrhages that he recognized as signs of asphyxiation, namely, a crescent-shaped abrasion on the left side of the victim's neck, that he attributed to pressure from a fingernail, and antemortem petechial hemorrhages[5] in the victim's lower left eyelid.

In addition, Katsnelson's autopsy disclosed other indications of asphyxiation. There were petechial hemorrhages in the posterior aspect of the heart and in the posterior and lateral aspect of the lung. There were

---

[5] Petechial hemorrhages are multiple, pinpoint hemorrhages that are often indicative of asphyxiation.

also antemortem hemorrhages on the left sternocleidomastoid muscle and the left sternohyoid muscle, located in the area where the neck connects to the collarbone.

Further, according to Katsnelson, the victim's hyoid bone, which is a horseshoe shaped bone located deep in the upper part of the neck, had a separation of its right horn with hemorrhages in the connecting soft tissue. Katsnelson testified that during the autopsy he had performed the extraction of the hyoid bone with particular care so as to avoid any artifactual[6] damage to it because, from his external observations of the victim's body, he had suspected manual strangulation as the cause of death. He testified that he had observed the separation before removing the bone from the soft tissue in the victim's neck. He also testified that, although he had nicked the left horn of the bone with his scalpel during the removal process, the separation of the right horn of the bone and the associated tissue hemorrhages were not artifactual. Katsnelson also testified that, in his opinion, the separation that he had observed in the right horn of the hyoid bone, and the hemorrhages that he had observed on the sternocleidomastoid and sternohyoid muscle on the victim's left side, indicated pressure from manual strangulation on both sides of the victim's neck. Katsnelson also testified that the victim's epiglottis area, including the vocal box, the vocal chords and the base of the tongue, had been swollen and had dark red hemorrhages. He could not exclude intubation, which is the insertion of a tube down the victim's throat, during resuscitation efforts as the cause of these findings.

Katsnelson testified further that, although the body had no external injuries ordinarily associated with man-

---

[6] In this context, the various forensic pathologists used the term "artifact" to mean something caused during the resuscitation effort or the autopsy procedure, rather than as evidence of the cause of death.

ual strangulation, other than the crescent-shaped mark on the left side of the neck, "it is possible to strangle a person without evidence of [external] injuries." Moreover, although the victim had a blood level of cocaine of 2.63 milligrams per liter, in Katsnelson's opinion that was not necessarily a fatal level, particularly because she had inhaled, rather than injected, the cocaine and, in his experience, fatal inhalation of cocaine usually evinces a blood level of nearly 4 milligrams per liter. Thus, Katsnelson concluded, that on the basis of his performance of the autopsy, which included his personal examination of all pertinent parts of the victim's body, the cause of the victim's death was asphyxiation resulting from manual strangulation, and not cocaine intoxication.

Gross, who had been the chief medical examiner for the state of Connecticut and was at the time of trial the chief medical examiner for the city of New York, had examined the petitioner's statement, Katsnelson's autopsy report, certain photographs that had been taken during the autopsy, parts of the victim's neck area, namely, her tongue, larynx, thyroid cartilage and hyoid bone, and certain wet tissue specimens from that area. On the basis of his examination of those photographs, he was of the opinion that the crescent-shaped mark on the left side of the victim's neck had been caused by a mask having been placed over her face during resuscitation efforts. He also conceded, however, that the mark was consistent with manual strangulation. It was also his opinion, based on his examination of the photographs, that the hemorrhages in the victim's eyes were not petechial, that the hemorrhages in the left sternocleidomastoid muscle and left sternohyoid muscle had been caused by intubation during resuscitation efforts, and that hemorrhages on the surface of the victim's heart muscle were consistent with a cocaine-induced convulsion, as the petitioner had

described in his statement. Gross also opined, based on his examination of the hyoid bone, that the separation in the right horn of the bone was artifactual, having been caused by Katsnelson during the autopsy. It was also Gross' opinion, based on his examination of the tissues, that the hemorrhages in the epiglottis area were not petechial, and had been caused by intubation.

Gross further testified that one would expect to find significant external injuries on the victim's body following manual strangulation, but that they do not always occur in such a case. He also testified that he had not prepared or examined any microscopic slides of the victim's tissues, and that, if injuries had occurred within one hour of death, such slides would not have conclusively shown whether the injuries occurred before or after death. Gross testified further that, in his opinion, the cause of death was acute cocaine intoxication.

Sturner had examined Katsnelson's autopsy report, Gross' report of his findings, the hospital report of resuscitation efforts, including summaries of interviews with emergency room personnel, the report of the emergency medical personnel who had been summoned to the hotel, autopsy photographs of the victim's body, the wet tissue specimens of the victim's laryngeal area, the victim's hyoid bone itself, the arrest warrant affidavit, and the transcript of the probable cause hearing. He also prepared and examined microscopic slides of four areas: the hyoid bone separation; the right epiglottis; the left epiglottis; and the left upper trachea. He testified that the purposes of such slides were to confirm findings made by visual examination, and to disclose any new information bearing on the question of whether certain injuries had been inflicted before or after death.

On the basis of the autopsy photographs, Sturner testified that, in his opinion: the crescent-shaped mark had been inflicted by a fingernail antemortem; the hemorrhages in the left eyelid were petechial; and the hemorrhages on the left sternocleidomastoid muscle and the left sternohyoid muscle had not been caused by intubation or resuscitation efforts. With regard to the hyoid bone separation, Sturner could not give an opinion as to whether the separation was artifactual; he could not tell from his visual examination of the bone itself, and his microscopic slides neither confirmed nor ruled out either possibility.

On the basis of the slides, however, Sturner was able to give his opinion regarding the hemorrhages in the epiglottis area and the trachea. He testified that he found, by visual examination, hemorrhages on the epiglottis areas, and that the microscopic slides confirmed his opinion that these hemorrhages were on both sides, had been caused before death, and had not been caused by intubation. Similarly, he testified that, on the basis of his visual examination, which was confirmed by the slides, the hemorrhages on the trachea were petechial, had been caused before death by asphyxia, and had not been caused by intubation. Relying on his observations, Sturner testified further that, in his opinion, the cause of death had not been cocaine intoxication.

All three forensic pathologists agreed that, in a given case, different pathologists could view the same data and reach different conclusions about the cause of death. That much is apparent from their testimonies.[7] Thus, the differences in their opinions resulted from differing interpretations of the same data.

[7] Indeed, that is also apparent from the testimony of Mark Taff, the petitioner's expert in these habeas proceedings. See infra.

The petitioner's criminal trial concluded with the judgment of conviction rendered on December 5, 1985. The Appellate Court affirmed the judgment of conviction on January 5, 1988. See State v. Summerville, supra, 13 Conn. App. 175.

II

The petitioner brought this habeas corpus action by way of a petition, in two counts, filed on September 14, 1990.[8] In the first count, the petitioner alleged that he had been deprived of his rights to due process of law, under the fourteenth amendment to the United States constitution and article first, § 8, of the Connecticut constitution, because the medical evidence that had been presented to the jury "was unreliable as indicia of manual strangulation." Specifically, he alleged that the evidence was "medically unreliable" because the hemorrhage in the victim's left eyelid was not petechial, the petechial hemorrhages on the heart surface were consistent with cardiopulmonary resuscitation performed on the victim, the hemorrhage of the sternocleidomastoid muscle was not petechial, the hemorrhages to the laryngeal area were not petechial, and the crescent-shaped abrasion on the victim's neck was "at the jawline."

In the second count, the petitioner alleged ineffective assistance of his trial counsel, under the sixth and fourteenth amendments to the United States consti-

[8] In fact, this petition was the plaintiff's second amended petition. The first, filed pro se in December, 1988, alleged that the trial court had "abused its discretion in limiting the defendant's cross-examination, and other issues." The first amended petition, filed on November 3, 1989, alleged two counts of ineffective assistance of trial counsel based upon: (1) that counsel's failure adequately to investigate the victim's medical history, failure to accept the state's offer of a continuance for Gross to examine Sturner's microscopic slides, and failure adequately to investigate and present certain exculpatory evidence; and (2) that counsel's failure to inform the petitioner of his right to petition for certification to this court following the affirmance of his conviction by the Appellate Court.

tution and article first, § 8, of the Connecticut constitution. Specifically, he alleged that his trial counsel had failed: to request a continuance, or to accept the state's offer of a continuance, for Gross to examine Sturner's microscopic slides; to research the difference between the manners of development of petechial and non-petechial hemorrhages; and to present surrebuttal evidence that the laryngeal hemorrhage was not petechial.

During the habeas trial, the habeas court permitted the petitioner to amend his petition further in order to conform to his proof. His third amended petition, filed in court on January 31, 1991, differed from the second amended petition only with respect to the allegations in the first count that the medical evidence at trial had been medically unreliable. Whereas in the second amended petition he had alleged that "[t]he hemorrhages to the laryngeal area were not petechial," in this third amended petition he alleged that "[t]he hemorrhages to the laryngeal area were more consistent with attempts to resuscitate the victim by intubation than with manual strangulation." The allegations of the second count, regarding the petitioner's ineffective assistance of counsel claim, remained the same.

At the habeas hearing, the evidence pertinent to the petitioner's claim, on the first count, that the evidence of the victim's death was medically unreliable consisted of the testimony of Katsnelson and of Mark Taff, a forensic pathologist. Katsnelson was called by the petitioner for the purpose of introducing into evidence certain records, including the hospital report of death, the toxicology report, Katsnelson's autopsy report, and Sturner's slides. Thereafter, in response to questions by the habeas court, Katsnelson testified that it was not a usual and necessary part of ordinary autopsy protocol to prepare microscopic slides. He testified further that such slides are prepared only if the medical examiner decides that they are needed, and that, in this case,

although he had been informed about the resuscitation efforts on the victim, the injuries he had observed were not consistent with such efforts.

At the time of the petitioner's criminal trial, Taff had been the deputy medical examiner for the Nassau County Medical Examiner's Office in New York. Taff had reviewed Katsnelson's autopsy report, the toxicology reports regarding the level of cocaine in the victim's blood, the autopsy photographs, the microscopic slides prepared by Sturner, and reports of the Stamford police department, hospital reports, and summaries of interviews with hospital personnel. Thus, he had not examined any of the actual body parts of the victim, including the hyoid bone, or the wet tissue specimens of her epiglottis area, which were no longer available when he was employed by the petitioner for these proceedings. He also had not reviewed the trial testimony of Aiello, Cinque or Osorio.

Taff testified that it was his opinion, based on the materials that he had reviewed, that the crescent-shaped mark on the victim's neck was not a significant finding and that the mark was attributable to someone having handled the victim's head or to the victim having scratched herself. Regarding the hemorrhages in the victim's left eyelid, it was Taff's opinion that they were confluent, not petechial, hemorrhages, and that they had been caused by the victim having fallen and hit the left side of her head. He testified further in this regard that, had there been manual strangulation, he would have expected to see right eyelid hemorrhaging as well. Taff agreed with Katsnelson's opinion that there were petechial hemorrhages on the posterior aspect of the victim's heart and on the posterior and lateral aspects of her lungs, but Taff attributed these hemorrhages to cardiopulmonary resuscitation. Regarding the hemorrhages on the victim's left sternocleidomastoid muscle and left sternohyoid muscle,

it was Taff's opinion that these hemorrhages had been caused by Katsnelson's having nicked the victim's jugular vein during the autopsy, and that these hemorrhages were not what one would expect to see as a result of manual strangulation. Taff also testified that it was his opinion that the separation of the hyoid bone was artifactual, having been caused during its removal by Katsnelson during the autopsy. Regarding the epiglottis area, Taff testified that there were small focal hemorrhages and small areas of petechial hemorrhages on both the right and left sides of the vocal chords. It was his testimony that these had been caused by intubation and other efforts at resuscitation.

Furthermore, Taff considered it significant that there were no external injuries indicating manual strangulation. Considering the toxic blood level of cocaine, the petitioner's statement that the victim had suffered a seizure, and the lack of findings consistent with manual strangulation, Taff opined that the cause of the victim's death had been acute cocaine intoxication.

The evidence pertinent to the petitioner's claim, on the second count, of ineffective assistance of counsel consisted of the testimony of Stephen F. Donahue, the petitioner's trial counsel, and of Richard Brown, a criminal trial lawyer. Donahue testified to his reasons for having declined the state's offer of a continuance for the purpose of obtaining a review by Gross of Sturner's slides.[9] Brown gave his opinion that Donahue's failure to have the slides examined constituted ineffective assistance of counsel.

---

[9] "Although he believed that the trial court would have agreed to a short continuance, Donahue explained that his decision to forego a continuance was based on the following factors: (1) he believed that the testimony by Sturner was improper and would be a successful ground for appeal; (2) he believed that Gross had become unavailable to him because Gross was then testifying in a lengthy and highly publicized case in New York; (3) he did not know what Gross would conclude upon review of the slides; (4) he felt

The habeas court rejected both of the petitioner's claims. With respect to the claim of unreliable medical evidence, the habeas court found that "Taff's examination of the slides prepared for Dr. Sturner was significant only with respect to the manner in which the hyoid bone was fractured. His opinion concurred with that of Dr. Gross, that the fracture occurred during the autopsy procedure." The habeas court reasoned that, if it chose to believe Taff's testimony in toto, it would be usurping the function of the jury at the petitioner's criminal trial, because "[a]s it unfolded, the trial of [the petitioner] could best be summarized as a battle of the experts" over the cause of death. The habeas court reasoned that it was for the jury to accept or reject, in whole or in part, any such expert testimony. The court concluded that Gross' opinion as to the cause of death had been rejected by the jury, and that Taff's conclusions did not constitute new evidence but were based on the same evidence that had been available at the trial. The court therefore rejected a review of the conflicting expert testimony as not properly within the scope of the writ of habeas corpus.

With respect to the claim of ineffective assistance of counsel, the habeas court found, on the basis of Donahue's testimony, that Donahue had exercised his judgment after weighing the pros and cons of securing a continuance for Gross to review the slides. The court concluded that (1) the petitioner had not proven by a preponderance of evidence that Donahue's performance had not been reasonably competent, and (2) even if that performance had been less than reasonably competent, the petitioner had not established that the failure to

that the case had already been fraught with continuances requested by the defense due to limitations on Gross' availability and that another continuance could possibly agitate or alienate the jury; and (5) he believed that he had already established reasonable doubt based on Gross' testimony." *Summerville* v. *Warden,* supra, 29 Conn. App. 168–69.

have either Gross or some other expert review the slides contributed to his conviction. Accordingly, the habeas court dismissed the petition.

The petitioner thereafter filed a petition for certification to appeal to the Appellate Court from the judgment of the habeas court, pursuant to General Statutes § 52-470 (b).[10] In accordance with the certification granted by the habeas judge pursuant to § 52-470, the two questions that the petitioner sought to have reviewed by the Appellate Court were: (1) "Did the habeas court err in its conclusion that it is not within the province of the habeas court to make a determination relative to the reliability/unreliability of a petitioner's trial evidence in order to decide a petitioner's claim of violation of due process?"; and (2) "Did the habeas court err in its conclusion that [the] petitioner's trial counsel was not ineffective in rejecting and/or failing to request a continuance in order to investigate certain scientific forensic evidence presented by the state?"

The Appellate Court first considered the petitioner's ineffective assistance of counsel claim. Although it rejected as legitimate strategic concerns Donahue's first three reasons for declining to seek or accept a continuance; see footnote 9; the court concluded that, considering the facts supporting the fourth and fifth reasons; see *Summerville* v. *Warden,* supra, 29 Conn. App. 174–76; "Donahue [had] exercised reasonable judgment in not accepting a continuance to investigate

---

[10] General Statutes § 52-470 provides in relevant part: "SUMMARY DISPOSAL OF THE CASE. APPEAL BY PERSON CONVICTED OF CRIME. . . .

"(b) No appeal from the judgment rendered in a habeas corpus proceeding brought in order to obtain his release by or in behalf of one who has been convicted of crime may be taken unless the appellant, within ten days after the case is decided, petitions the judge before whom the case was tried or a judge of the supreme court or appellate court to certify that a question is involved in the decision which ought to be reviewed by the court having jurisdiction and the judge so certifies."

the evidence relied on by the state in the rebuttal portion of its case." Id., 174. The Appellate Court, therefore, affirmed the habeas court's rejection of the petitioner's claim of ineffective assistance of counsel. Id., 176.

The Appellate Court then turned to the petitioner's claim that, based on Taff's testimony, he had been denied a fair trial because the medical evidence presented at his trial regarding the cause of death was unreliable. The Appellate Court noted that the habeas court had not evaluated Taff's testimony because it had concluded that it lacked the authority on habeas corpus "to inquire into the sufficiency of the evidence or the resolution of the facts that supported the petitioner's conviction." Id., 177. Reading the petitioner's claim to be, not that his conviction was unsupported by sufficient evidence, but rather that Taff's testimony, which had not been presented at his trial, sufficiently undermined the conclusiveness of the jury's fact-finding process so as to mandate a new trial, the Appellate Court cast the issue as follows: "If this claim, that the medical evidence presented against him at trial was unreliable and therefore violated his right to a fair trial, is properly raised in a petition for a writ of habeas corpus, then we must remand the case to the habeas court for further consideration." Id., 178.

The Appellate Court concluded that, because the petitioner's claim was properly raised in a habeas corpus proceeding, and because the habeas court had not examined the merits of the petitioner's claim—i.e., the credibility of Taff's testimony and its likely effect on the jury's verdict—"and might have ruled differently had these merits been explored"; id., 180; the Appellate Court was required to "remand the case to the habeas court for further consideration of the merits of the petitioner's claim that his conviction was based on unreliable medical evidence." Id. The Appellate Court,

therefore, ordered that, on the remand, the habeas court "carefully examine the new medical evidence bearing on the issue of the cause of the victim's death in order to determine the effect the new evidence would have on a jury in rendering its verdict"; id.; and that, in doing so, the habeas court "consider Taff's testimony in relation to the trial testimony considered by the jury . . . . If, after analyzing this evidence, the habeas court concludes that an injustice was done and that it is probable that a different result would be reached in a new trial, then the court must grant the writ." Id., 181. The Appellate Court gave the following reasons for this conclusion.

First, our habeas corpus statute, § 52-470 (a), requires the habeas court to "dispose of the case as law and justice require," and the petitioner's claim that no crime was committed "goes to the very essence of the constitutional guarantee of due process." Id., 179. Relying on *Bunkley* v. *Commissioner of Correction,* 222 Conn. 444, 460–61, 610 A.2d 598 (1992), the court reasoned that in order for a habeas corpus petitioner to demonstrate a fundamental unfairness or miscarriage of justice cognizable in a habeas corpus proceeding for a new trial, he must "show that he is burdened by an unreliable conviction." (Internal quotation marks omitted.) *Summerville* v. *Warden,* supra, 29 Conn. App. 179. Relying on *Taborsky* v. *State,* 142 Conn. 619, 116 A.2d 433 (1955), and *Reilly* v. *State,* 32 Conn. Sup. 349, 355 A.2d 324 (1976), the court reasoned that "[w]here new evidence undermines judicial confidence in the result reached such that it can be said that an injustice was likely done and that it is probable that a new trial would produce a different result, relief must be available through the writ of habeas corpus." *Summerville* v. *Warden,* supra, 29 Conn. App. 179.

Second, the Appellate Court relied on *State* v. *Hammond,* 221 Conn. 264, 268, 604 A.2d 793 (1992), for the

proposition that "[o]ne cogent reason for overturning the verdict of a jury is that the verdict is based on conclusions that are physically impossible." The Appellate Court characterized the petitioner's evidence in these proceedings, aimed at establishing that no crime had been committed because the victim's death had not been the result of manual strangulation, as evidence that, "if found to be such that a jury might reasonably credit [it], indicates that the petitioner's conviction was based on a scientific improbability, if not an impossibility." *Summerville* v. *Warden*, supra, 29 Conn. App. 179. The Appellate Court continued: "The exculpatory evidence proffered at the habeas hearing raises a serious question of whether a jury could reasonably have concluded that the petitioner was guilty beyond a reasonable doubt had the new evidence been before it, along with the evidence already considered at trial. *State* v. *Hammond*, supra, 286–87. Because that is so, and because our jurisprudence mandates that we give effect to the presumption of innocence even in a postconviction proceeding, a remand is necessary so that Taff's testimony and the facts established and the inferences reasonably drawn therefrom can be evaluated by the habeas court." *Summerville* v. *Warden*, supra, 180. We thereafter granted the petitioner's and the respondent's petitions for certification. This appeal and cross appeal followed.

### III

We first consider the question posed by the petitioner's petition for certification: "Did the Appellate Court correctly conclude that it should not decide the issue of whether an ineffective investigation by a defense expert witness in a fashion that impairs the petitioner's defense is impugned to the defense attorney?" We conclude that we improvidently granted the petition for certification regarding this issue, and we therefore decline to consider it.

Throughout these proceedings, the petitioner's presentation issue is a part of his claim under the second count of the petition for habeas corpus, namely, ineffective assistance of counsel. The petitioner's claim rests on the premise that at the petitioner's criminal trial Gross' failure, in the first instance, even before Sturner's testimony, to have microscopic slides prepared for purposes of forming his opinions and testifying thereto regarding the cause of the victim's death, constituted ineffective investigation by Gross as an expert witness. From this premise, the petitioner argues that Gross' ineffective investigation was attributable to Donahue, as the petitioner's attorney, and thereby constituted ineffective assistance of counsel. From these premises, the petitioner argues that the Appellate Court should have considered the question presented by his petition for certification.

Whatever the merits of such an argument may be in a case that presents it, it is clear from this record that this is not such a case. The claim that Gross, as an expert defense witness, performed his investigative function ineffectively, and that his inadequacy in that regard was attributable to the petitioner's counsel for purposes of a constitutional claim of ineffective assistance of counsel, cannot be gleaned from this record. It is not fairly within even a generous reading of any of the petitioner's various amended petitions, including the last petition, which was filed during the hearing in order to make his pleading conform to his proof. It was not litigated before the habeas court;[11] it was

---

[11] The following history leads us to conclude that the question posed by the petitioner's petition for certification was not litigated in the habeas court. First, the adequacy of Gross' performance was not questioned until final argument; and even then, only in the petitioner's response to a question by the habeas court, and in the context of the petitioner's claim that the medical evidence was unreliable rather than his claim of ineffective assistance of counsel. Second, it is clear that, as the case was tried, even the petitioner's counsel was surprised by the suggestion. She had not thought

not decided—or even referred to—by the habeas court in its memorandum of decision. Thereafter, the petitioner did not request the habeas court to articulate its decision further to consider such a claim. Finally, it is not within the questions that the petitioner requested the habeas court to certify for appellate review.

Under these circumstances, it is hardly surprising that the Appellate Court did not consider the petitioner's claim. We decline to do so as well.

IV

We turn next to the question posed by the respondent's petition for certification: ''Did the Appellate Court have proper grounds for remanding this case to the habeas court for a consideration of expert testimony that was not presented at the petitioner's criminal trial?'' The respondent argues that the Appellate Court (1) applied improper standards of habeas corpus review of final convictions, (2) improperly afforded the petitioner the presumption of innocence in this collateral attack on the petitioner's conviction, and (3) improperly characterized Taff's testimony as new medical evidence

about such an argument and was unprepared to produce authority for it. Indeed, she had filed an extensive trial brief shortly before the habeas hearing began that does not present this argument at all. She subsequently filed a posttrial brief citing *Stubbs* v. *Thomas,* 590 F. Sup. 94 (S.D.N.Y. 1984). *Stubbs,* however, does not address ineffective assistance of an expert witness. Third, this case notably lacks the evidence that we would expect to see in support of, and in opposition to, such a claim: expert testimony regarding the standards required to be followed by a forensic pathologist; expert opinions that Gross' conduct fell below, or met, those standards; and live testimony from Gross in these proceedings explaining his course of conduct. Indeed, if anything, Katsnelson's testimony regarding ordinary autopsy protocols contradicted any such claim. Fourth, the absence from the habeas court's memorandum of decision of any reference to this argument indicates that, despite its suggestion during the petitioner's final argument, this argument was not part of the case as presented to the court.

that was sufficient to undermine confidence in the reliability of the jury's verdict in the petitioner's criminal trial. We agree.

The standards that generally govern a habeas corpus petition seeking a new trial are well established. "The principal purpose of the writ of habeas corpus is to serve as a bulwark against convictions that violate fundamental fairness. *Engle* v. *Isaac,* 456 U.S. 107, 126, 102 S. Ct. 1558, 71 L. Ed. 2d 783 (1982), quoting *Wainwright* v. *Sykes,* 433 U.S. 72, 97, 97 S. Ct. 2497, 53 L. Ed. 2d 594 (1977) (Stevens, J., concurring). This court has taken the same view. To mount a successful collateral attack on his conviction, a prisoner must demonstrate a miscarriage of justice or other prejudice and not merely an error which might entitle him to relief on appeal. *Hill* v. *United States,* 368 U.S. 424, 428, 82 S. Ct. 468, 7 L. Ed. 2d 417, reh. denied, 369 U.S. 808, 82 S. Ct. 640, 7 L. Ed. 2d 556 (1962). *D'Amico* v. *Manson,* 193 Conn. 144, 156–57, 476 A.2d 543 (1984); see also *Bowers* v. *Warden,* 19 Conn. App. 440, 441, 562 A.2d 588, cert. denied, 212 Conn. 817, 565 A.2d 534 (1989). In order to demonstrate such a fundamental unfairness or miscarriage of justice, the petitioner should be required to show that he is burdened by an unreliable conviction." (Internal quotation marks omitted.) *Bunkley* v. *Commissioner of Correction,* supra, 222 Conn. 460–61.

It is important to clarify initially what is not, and what is, involved in our consideration of this issue. The petitioner does not claim that the evidence of guilt at his criminal trial was insufficient. The Appellate Court rejected that claim in his original appeal; *State* v. *Summerville,* supra, 13 Conn. App. 175; and habeas corpus is not designed to relitigate that issue. *Payne* v. *Robinson,* 207 Conn. 565, 568, 541 A.2d 504, cert. denied, 488 U.S. 898, 109 S. Ct. 242, 102 L. Ed. 2d 230 (1988);

*Cajigas* v. *Warden,* 179 Conn. 78, 81, 425 A.2d 571 (1979); *Vena* v. *Warden,* 154 Conn. 363, 365, 225 A.2d 802 (1966).

The petitioner's claim is instead that he is entitled by way of habeas corpus to a new trial because the evidence at his criminal trial was medically unreliable. That claim, however, is independent of and unrelated to any claim that his conviction was otherwise affected by some antecedent constitutional error that affected his trial. Thus, in the context of this issue he cannot claim that his criminal trial was unfair because, for example, his counsel was ineffective,[12] or evidence was unconstitutionally introduced or excluded in that trial. We are not confronted, therefore, with a claim that he is burdened by an unreliable conviction resulting from such an antecedent constitutional violation. Compare, e.g., *Bunkley* v. *Commissioner of Correction,* supra, 222 Conn. 444 (habeas corpus claim for new trial based on constitutional claim of ineffectiveness of appellate counsel); *Phillips* v. *Warden,* 220 Conn. 112, 595 A.2d 1356 (1991) (habeas corpus claim for new trial based on constitutional claim of ineffectiveness of trial counsel flowing from actual conflict of interest).

The petitioner's claim is, as he states, one of "factual innocence." On the basis of Taff's testimony that the cause of death of the victim was not asphyxiation resulting from manual strangulation, but acute cocaine intoxication, the petitioner claims that he is the victim of a miscarriage of justice because *"no crime was committed."* (Emphasis in original.) In support of this claim,

[12] We note that our grants of certification to appeal in this case did not, except as discussed in the context of the petitioner's certification petition that we have declined to consider, challenge the conclusion of the Appellate Court affirming the habeas court's determination that the petitioner had not established his claim of ineffective assistance of counsel. Our consideration of this issue, therefore, must proceed upon the assumption that, apart from the petitioner's claim that the evidence at his criminal trial was medically unreliable, his trial was constitutionally fair.

he argues that the Appellate Court was correct in its analysis of his claim because, as that court concluded: (1) under the circumstances of this case, he is entitled to the presumption of innocence; (2) Taff's testimony constituted new evidence requiring a new trial; and (3) Taff's testimony in the habeas court, "juxtaposed against the medical testimony presented at the criminal trial," indicates that the petitioner's "conviction was based upon a scientific improbability, if not an impossibility." (Internal quotation marks omitted.) Because the petitioner's arguments mirror, and share the same assumptions as, the reasoning of the Appellate Court, and because on certification our focus is ordinarily on the opinion of that court; *Cahn* v. *Cahn,* 225 Conn. 666, 671, 626 A.2d 296 (1993); *State* v. *Beckenbach,* 198 Conn. 43, 47, 501 A.2d 752 (1985); we address those arguments and assumptions.

The foundational question is whether habeas corpus permits the granting of a new trial pursuant to a petitioner's claim of actual innocence, unadorned by an antecedent showing of a constitutional violation that affected the fairness of his criminal trial. We conclude that it does.

Habeas corpus is the ultimate inquiry into the fundamental fairness of a criminal proceeding. See, e.g., *Lozada* v. *Warden,* 223 Conn. 834, 840, 613 A.2d 818 (1992); *Safford* v. *Warden,* 223 Conn. 180, 190, 612 A.2d 1161 (1992); *Bunkley* v. *Commissioner of Correction,* supra, 222 Conn. 460. In *Murray* v. *Carrier,* 477 U.S. 478, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986), the United States Supreme Court held that the cause and prejudice standard applies to procedural defaults by state appellate counsel for purposes of federal habeas corpus jurisprudence. The court carved out an exception, however, for certain claims of actual innocence: "Accordingly, we think that in an extraordinary case, where a constitutional violation has probably resulted

in the conviction of one who is actually innocent, a federal habeas corpus court may grant the writ even in the absence of a showing of cause for the procedural default." Id., 496. Similarly, this court, in holding that the cause and prejudice standard applies to appellate procedural defaults for purposes of our own habeas corpus jurisprudence, made clear that our holding was not meant to preclude "a substantial claim of innocence in fact." *Jackson* v. *Commissioner of Correction*, 227 Conn. 124, 132 n.7, 629 A.2d 413 (1993).

We now hold, therefore, what we implied in *Jackson*, namely, that a substantial claim of actual innocence is cognizable by way of a petition for a writ of habeas corpus, even in the absence of proof by the petitioner of an antecedent constitutional violation that affected the result of his criminal trial. This holding is consistent with the mandate of § 52-470 (a) that the habeas court "dispose of the case as law and justice require." Even the strong interest in the finality of judgments, and the state's interest in retrying a defendant with reasonably fresh evidence, does not require the continued imprisonment of one who is actually innocent. This holding is also consistent with our prior statements that habeas corpus is designed to remedy fundamental miscarriages of justice. See, e.g., *D'Amico* v. *Manson*, supra, 193 Conn. 144. The continued imprisonment of one who is actually innocent would constitute a miscarriage of justice.

Contrary to the petitioner's argument, however, such an inquiry, as a collateral attack on a conviction, cannot rely on the presumption of innocence because that presumption does not survive a judgment of conviction. It is undoubtedly true that "[a] person when first charged with a crime is entitled to a presumption of innocence, and may insist that his guilt be established beyond a reasonable doubt. *In re Winship*, 397 U.S. 385, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970)." *Herrera*

v. *Collins,* U.S. , 113 S. Ct. 853, 859, 122 L. Ed. 2d 203 (1993). It is also true that other constitutional provisions, such as the right to counsel, the right of confrontation, the right to compulsory process, the requirement of proof beyond a reasonable doubt, and the right to exculpatory evidence, "also have the effect of ensuring against the risk of convicting an innocent person." Id. "All of these constitutional safeguards . . . make it more difficult for the State to rebut and finally overturn the presumption of innocence which attaches to every criminal defendant." Id., 860.

The presumption of innocence, however, does not outlast the judgment of conviction at trial. "Once a defendant has been afforded a fair trial and convicted of the offense for which he was charged, the presumption of innocence disappears. Cf. *Ross* v. *Moffitt,* 417 U.S. 600, 610, 94 S. Ct. 2437, 41 L. Ed. 2d 341 (1974) ('The purpose of the trial stage from the State's point of view is to convert a criminal defendant from a person presumed innocent to one found guilty beyond a reasonable doubt'). Here, it is not disputed that the State [has] met its burden of proving at trial that [the] petitioner was guilty of [manslaughter in the first degree] beyond a reasonable doubt. Thus, in the eyes of the law, [the] petitioner does not come before the Court as one who is 'innocent,' but on the contrary as one who has been convicted by due process of law of [manslaughter in the first degree]." Id.[13]

---

[13] In this respect, the petitioner's and the Appellate Court's reliance on language we employed in *State* v. *Hammond,* supra, 221 Conn. 288–89—"[b]ecause [the trial court's] ruling [on the defendant's motion for a new trial] implicates the constitutional right to a presumption of innocence . . . we therefore remand this case to the trial court for reconsideration of the defendant's motion to set aside the verdict in light of the considerations discussed herein"—is misplaced. *Hammond* was not a habeas corpus case. It was an appeal from the trial court's denial of the defendant's posttrial motion for a new trial, based upon the trial court's power, in extraordinary cases, to set aside a verdict even where there was evi-

Any other conclusion would be inconsistent with the fact that our habeas corpus jurisprudence places a heavy burden on the petitioner to establish that, notwithstanding his conviction, he is entitled to a new trial. *Lubesky* v. *Bronson,* 213 Conn. 97, 110, 566 A.2d 688 (1989); *Myers* v. *Manson,* 192 Conn. 383, 387, 472 A.2d 759 (1984). Put another way, it would be anomalous to say that one who is presumed to be innocent nonetheless bears a heavy burden to prove that he is entitled to a new trial because he is actually innocent. If the presumption of innocence means anything, it means that one who is clothed with it does not bear the burden of establishing his innocence. Furthermore, attaching the presumption of innocence to a habeas corpus petitioner would be inconsistent with the well recognized difficulties and costs often occasioned by the issuance of a writ of habeas corpus years after the original conviction. See *Johnson* v. *Commissioner of Correction,* 218 Conn. 403, 589 A.2d 1214 (1991). Thus, we reject the conclusion that the petitioner was entitled, in these proceedings, to the presumption of innocence.

We also do not share the assumption, engaged in by both the petitioner and the Appellate Court, that underlies the view that Taff's testimony, if credited, con-

dence supporting the verdict. Id., 268. Thus, in *Hammond,* we were reviewing, not a collateral attack on the defendant's conviction, but the rare instance of the trial court's exercise of its discretion as, in effect, a supervising additional juror, sitting to guarantee that a jury verdict was not governed by such improper factors as "ignorance, prejudice, corruption or partiality." (Internal quotation marks omitted.) Id.

In *Hammond,* moreover, the extraordinary situation was that the verdict was unreliable because, based on both the undisputed blood typing and DNA evidence in the case, it was physically impossible for the defendant to have been guilty of the sexual assault of which he had been convicted. Id., 279. As is demonstrated infra, the petitioner's evidence in this case falls far short of a showing of such physical or scientific impossibility.

Finally, *Hammond* did not address and cannot fairly be read as holding that the presumption of innocence applies to a petitioner who seeks to overturn his conviction by way of habeas corpus. Such a holding would be inconsistent with our body of habeas corpus jurisprudence.

stituted new evidence requiring the habeas court to grant a new trial. That assumption is that the standards for a habeas court in ruling on a petition for a writ of habeas corpus based on a claim of actual innocence are the same as the standards for a trial court in ruling on a petition for a new criminal trial on the ground of newly discovered evidence, pursuant to General Statutes §§ 54-95 (a) and 52-270.[14]

The petitioner relies, for his claim that Taff's testimony constituted new evidence of actual innocence, on cases decided upon petitions for new trials because of newly discovered evidence. See, e.g., *Taborsky* v. *State*, 142 Conn. 619, 116 A.2d 433 (1955); *Reilly* v. *State*, 32 Conn. Sup. 349, 355 A.2d 324 (1976). The primary test for determining whether a new trial should be

---

[14] General Statutes § 54-95 (a) provides: "APPEAL BY DEFENDANT IN CRIMINAL PROSECUTION; STAY OF EXECUTION. (a) Any defendant in a criminal prosecution, aggrieved by any decision of the superior court, upon the trial thereof, or by any error apparent upon the record of such prosecution, may be relieved by appeal, *petition for a new trial* or writ of error, *in the same manner and with the same effect as in civil actions.* No appeal may be taken from a judgment denying a petition for a new trial unless, within ten days after the judgment is rendered, the judge who heard the case or a judge of the supreme court or the appellate court, as the case may be, certifies that a question is involved in the decision which ought to be reviewed by the supreme court or by the appellate court. It shall be sufficient service of any such writ of error or petition for a new trial to serve it upon the state's attorney for the judicial district where it is brought."

The reference to a petition for a new trial "in the same manner and with the same effect as in civil actions" is to General Statutes § 52-270, which provides in part: "CAUSES FOR WHICH NEW TRIALS MAY BE GRANTED. (a) The superior court may grant a new trial of any action that may come before it, for mispleading, the discovery of new evidence or want of actual notice of the action to any defendant or of a reasonable opportunity to appear and defend, when a just defense in whole or part existed, or the want of actual notice to any plaintiff of the entry of a nonsuit for failure to appear at trial or dismissal for failure to prosecute with reasonable diligence, or for other reasonable cause, according to the usual rules in such cases. The judges of the superior court may in addition provide by rule for the granting of new trials upon prompt request in cases where the parties or their counsel have not adequately protected their rights during the original trial of an action."

granted because of newly discovered evidence "is whether an injustice was done and whether it is probable that on a new trial a different result would be reached." *Taborsky* v. *State,* supra, 623. The plaintiff has the burden of proving the probability of a different result. Id. Furthermore, the new evidence must not have been discoverable and producible at the original trial by the exercise of due diligence, and must not be cumulative. Id. Even cumulative evidence, however, "can be grounds for a new trial if it appears reasonably certain that injustice has been done in the judgment rendered and that the result of a new trial will probably be different. *Pass* v. *Pass,* 152 Conn. 508, 512 [208 A.2d 753 (1965)]." (Internal quotation marks omitted.) *Reilly* v. *State,* supra, 355. Furthermore, the scope of review of a trial court's decision to grant a new trial on the basis of newly discovered evidence is limited to whether the trial court abused its discretion. *Taborsky* v. *State,* supra, 623.

A critical limitation on the exercise of the trial court's discretion in passing upon such a petition for a new trial, however, is the statute of limitations. "No petition for a new trial in any civil or criminal proceeding shall be brought but within three years next after the rendition of the judgment or decree complained of." General Statutes § 52-582. The three year period begins to run from the date of rendition of judgment by the trial court; *Varley* v. *Varley,* 181 Conn. 58, 434 A.2d 312 (1980); which, in a criminal case, is the date of imposition of the sentence by the trial court. *State* v. *Coleman,* 202 Conn. 86, 89, 519 A.2d 1201 (1987).

The three year statute of limitations on a petition for a new trial based on newly discovered evidence is the product of the legislature's balancing of the interests of the petitioner against the interests of the public and the state. The petitioner's interest is in attempting to establish that he is probably not guilty and that, there-

fore, the verdict in his criminal trial should be overturned. The state's interests are in preserving the finality of judgments, in not degrading the properly prominent place given to the original trial as the forum for deciding the question of guilt or innocence within the limits of human fallibility, and in the fact that in many cases an order for a new trial may in reality reward the accused with complete freedom from prosecution because of the debilitating effect of the passage of time on the state's evidence. *Bunkley* v. *Commissioner of Correction,* supra, 222 Conn. 461–63.

Indeed, one of the principal purposes of any statute of limitations is to enhance the reliability of fact-finding, based upon the common sense notions that the unreliability of fact-finding increases with the passage of time; see *Herrera* v. *Collins,* supra, 113 S. Ct. 862 ("the passage of time only diminishes the reliability of criminal adjudications"); *McCleskey* v. *Zant,* 499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991); *United States* v. *Smith,* 331 U.S. 469, 476, 67 S. Ct. 1330, 91 L. Ed. 1610 (1947); and that it is wise public policy to minimize that degree of unreliability by barring the fact-finding process after the applicable limitations period. See *Bunkley* v. *Commissioner of Correction,* supra, 222 Conn. 462.

Thus, for a petition for a new trial, within the three year limitations period, the petitioner's interests trump those of the public and the state. Beyond that period, however, the interests of the public and the state trump those of the petitioner.

Principally because of the absence of any statute of limitations governing the writ of habeas corpus; *United States* v. *Smith,* supra, 331 U.S. 476; the standards governing the issuance of the writ based on a claim of actual innocence are not, however, necessarily the same as those governing a petition for a new trial based upon

newly discovered evidence. Employing the same standard for both petitions would ignore the legislative determination embodied in the statute of limitations. The principal purpose of the writ of habeas corpus is to serve as a bulwark against violations of fundamental fairness. *Bunkley* v. *Commissioner of Correction,* supra, 222 Conn. 460–61. Whether there has been such a violation must be determined, not only with regard to the petitioner's claim, but also with regard to the effect of the issuance of the writ on the strong interest in the finality of judgments; *Myers* v. *Manson,* supra, 192 Conn. 387; and the other interests embodied in the statute of limitations. See *Engle* v. *Isaac,* supra, 456 U.S. 126; *Bunkley* v. *Commissioner of Correction,* supra, 461–62.

We have, therefore, imposed on a habeas corpus petitioner certain requirements that reflect these policy interests. For example, we have imposed a heavy burden of proof on the petitioner to establish that he is entitled to a new trial. *Lubesky* v. *Bronson,* supra, 213 Conn. 110. We have also adopted the "cause and prejudice" standard for the reviewability in a habeas corpus proceeding of constitutional claims not adequately preserved at trial; *Johnson* v. *Commissioner of Correction,* supra, 218 Conn. 409; or on appeal; *Jackson* v. *Commissioner of Correction,* supra, 227 Conn. 130; because of a procedural default.

Those requirements, which stem largely from the fact that a habeas corpus petition may properly be brought at any time,[15] rest in significant part on the costs to the public interests that are incurred when the state is required to retry a defendant many years after the

---

[15] Of course, the ability to bring a habeas corpus petition at any time is limited by the traditional doctrine of abuse of the writ based upon unnecessary successive petitions. See *Sanders* v. *United States,* 373 U.S. 1, 16, 83 S. Ct. 1068, 10 L. Ed. 2d 148 (1963); *Lozada* v. *Warden,* supra, 223 Conn. 844.

events in question. See *Johnson* v. *Commissioner of Correction,* supra, 218 Conn. 403. The wholesale transplanting of the petition for a new trial standard to a habeas corpus petition based on a claim of actual innocence would not give due respect to those considerations. The petitioner who thinks that there is newly discovered evidence sufficient to overturn his verdict would have no incentive to bring that evidence before the court within the three year limitations period, and there would be no consequence of his failure to do so.[16] Thus, just as a habeas corpus petition may not be employed as a substitute for a direct appeal; *Payne* v. *Robinson,* supra, 207 Conn. 568; a habeas corpus petition is not a surrogate for a time barred petition for a new trial.

Similarly, the standard that we announced in *Bunkley* v. *Commissioner of Correction,* supra, 222 Conn. 444, for granting a new trial pursuant to a writ of habeas corpus based on ineffectiveness of counsel, is not appropriate for this case. That standard is, in general terms, "whether there was a reasonable probability that, but for [the petitioner's] counsel's failure, the verdict would have been different." Id., 457. The rationale for that standard, however, does not support its transfer to this type of case.

That rationale is that, because of the antecedent, constitutional ineffectiveness of the petitioner's counsel

[16] Indeed, in this case, the petitioner did not allege his ultimate claim of actual innocence until nearly five years after his conviction in the trial court. Thus, we reject the dissent's argument that a habeas corpus petitioner's incarceration supplies sufficient incentive for him to bring forward his evidence of innocence as quickly as possible. It is evident that the incentive failed in this case. Presumably, the defense did not require five years to uncover or develop the testimony of Taff, who was in Nassau County, New York, at the time of the trial. Moreover, the dissent does not answer our argument that employing the petition for a new trial standard would mean that there would be no consequence of the petitioner's failure to meet the statute of limitations on a petition for a new trial.

in the original criminal proceedings, there was a break-down of the traditional adversarial process on which we rely to produce just results.[17] Therefore, precisely because of the breakdown of that traditional adversary process, our confidence in the reliability of the verdict in the criminal trial is undermined in a case in which the petitioner was hampered by constitutionally ineffective counsel at that trial. Based on that rationale, prejudice in the habeas corpus sense is established solely on the basis of a reasonable probability that, but for that ineffectiveness, the outcome would have been different.

That rationale is absent from this case, however, because in this case the petitioner's trial counsel was not ineffective, and therefore there was no breakdown of the adversarial process sufficient to undermine our confidence in the reliability of the verdict. Thus, this

---

[17] In *Bunkley*, we stated: "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial *cannot be relied on as having produced a just result.* (Emphasis added.) *Strickland* v. *Washington,* 466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Prejudice result[s] from a breakdown in the adversary process *that renders the result unreliable.* (Emphasis added.) Id., 687. The purpose of the Sixth Amendment guarantee of counsel is to ensure that a defendant has the assistance *necessary to justify reliance on the outcome of the proceeding.* Accordingly, any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution. (Emphasis added.) Id., 691–92. An ineffective assistance claim asserts the absence of one of the crucial assurances *that the result of the proceeding is reliable.* . . . (Emphasis added.) Id., 694. A reasonable probability [of a different result] is a probability *sufficient to undermine confidence in the outcome.* (Emphasis added.) Id. When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, *the factfinder would have had a reasonable doubt respecting guilt.* (Emphasis added.) Id., 695. In every case the court should be concerned with whether, despite the strong presumption of reliability, *the result of the particular proceeding is unreliable* because of a breakdown in the adversarial process that our system counts on *to produce just results.* (Emphasis added.) Id., 696." (Internal quotation marks omitted.) *Bunkley* v. *Commissioner of Correction,* supra, 222 Conn. 456–57 n.14.

case differs from *Bunkley* in the significant respect that, whereas in *Bunkley* the petitioner's claim on habeas corpus was twofold—(1) his counsel was ineffective, and (2) because of that ineffectiveness the verdict should be overturned and a new trial granted—in this case the petitioner lacks the first factor, and as a result, his foundation for the second factor is significantly weakened.

The petitioner's claim, to the contrary, is solely that, *despite* the fairness of the fact-finding process in his criminal trial, he is entitled to a new trial because, based on the evidence he now adduces, that fact-finding process was flawed in that the prior evidence was inherently unreliable. This critical difference between the two cases, and the roots that the *Bunkley* standard has in the unreliability of the first trial's factual outcome—roots that the petitioner's claim in this case does not share—persuade us that the *Bunkley* standard is inadequate to respond to the case of a claim of actual innocence unconnected to an antecedent constitutional violation that affected the reliability of the outcome of the first trial.

Both the petition for a new trial standard and the *Bunkley* standard rely essentially on a determination by the reviewing court—either the trial court passing on a petition for a new trial, or a habeas court passing on a claim of ineffectiveness of counsel—that, considering the evidence and claims now brought before it, together with the evidence produced at the original trial, there is a *probability* of a different result. Because neither of those standards appropriately fits the interests at stake in this type of habeas petition, we conclude that the standard should be more demanding than a probability of a different result. None of our prior habeas corpus jurisprudence, however, supplies us with a ready standard for this type of case.[18]

---

[18] This lacuna in our prior habeas jurisprudence is not surprising, because historically habeas corpus had a much more limited scope than its current

The issue then becomes the determination of the correct standard. Such a determination must recognize the tension inherent in the mandate of the statute that the habeas court "dispose of the case as law and justice require." General Statutes § 52-470 (a). What "law and justice require" is not a one-sided question. The standard must strike an appropriate balance between, on one hand, the risk that an actually innocent person may be incarcerated, despite his conviction after a fair trial, and, on the other hand, the risk that an actually guilty person, fairly convicted, may nonetheless be set free years later, principally because of the effect of the passage of time on the state's evidence and on the reliability of the fact-finding process.

The issue of the determination of the correct standard for this type of case can be divided into two components. The first question is: what is the legal standard that must be met by a habeas corpus petitioner claiming actual innocence in order to gain a new trial at which his guilt or innocence will again be determined? Put another way, what does "a substantial claim of actual innocence" mean in this context? The second question is: applying that standard, what evidence adduced by such a petitioner claiming actual innocence is sufficient to trigger the requirement of the habeas court to evaluate that evidence, together with and in light of the evidence produced at the petitioner's criminal trial, and, as a result of that evaluation, to permit the habeas court to issue the writ? We conclude, under the circumstances of this case, that we need not answer the first question, and need not elaborate on the sec-

usage. See *Carpenter* v. *Meachum,* 229 Conn. 193, 640 A.2d 591 (1994). It has not been until fairly recently that its scope has been expanded beyond such limited inquiries as the trial court's jurisdiction and the facial validity of the conviction. Id. Until this case, therefore, this court has never squarely held that a claim of actual innocence based on new evidence, unencumbered by a claim of antecedent constitutional violation going to the reliability of the verdict, is cognizable in habeas corpus proceedings.

ond question, because the petitioner's evidence was insufficient under any of the standards presented to us by the parties in this case or by other appropriate habeas corpus jurisprudence.

We turn for guidance to other standards that have been suggested for the resolution of this issue, namely, the standard that a habeas petitioner who claims actual innocence must meet in order to gain a new trial. The petitioner in effect offers only the standard applicable to a petition for a new trial for newly discovered evidence, which we have rejected. The respondent suggests that such a writ issue *"only upon the most compelling evidence* that a miscarriage of justice has occurred." (Emphasis added.)

In a slightly different context, the United States Supreme Court has wrestled with this problem. In *Herrera* v. *Collins,* supra, 113 S. Ct. 853, the court addressed a claim, in a federal habeas corpus proceeding, by a petitioner who had been convicted of two murders and sentenced to death by the Texas courts. In his federal petition filed approximately ten years after his conviction, he claimed, based on certain affidavits that he filed, that he was innocent of the murders and that the eighth and fourteenth amendments to the United States constitution "prohibit the execution of a person who is innocent of the crime for which he was convicted." Id., 859. Thus, he sought either a new trial or, in the alternative, that his death sentence be vacated. Id., 864.[19]

---

[19] In *Herrera*, after the United States District Court had ordered that the petitioner be granted an evidentiary hearing on his claim, the Court of Appeals vacated that order and held that "[a]bsent an accompanying constitutional violation . . . the petitioner's claim of actual innocence was not cognizable" in a federal habeas corpus proceeding. *Herrera* v. *Collins,* supra, 113 S. Ct. 859.

The United States Supreme Court held that the Court of Appeals was correct, because federal "habeas jurisprudence makes clear that a claim of 'actual innocence' is not itself a [federal] constitutional claim, but instead

The majority of the court assumed, arguendo, "that in a capital case *a truly persuasive demonstration of 'actual innocence'* made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim."[20] (Emphasis added.) Id., 869. On the basis of that assumption, the majority of the court held that, in part because of "the enormous burden that having to retry cases based on often stale evidence would place on the States, the threshold showing for such an assumed right would necessarily be *extraordinarily high.*" (Emphasis added.) Id. The majority held that the affidavits filed by the petitioner did not meet that standard. Id., 869–70.

Justice O'Connor, joined by Justice Kennedy, concurred separately. They agreed that federal habeas relief based upon claims of actual innocence must be "reserved for *extraordinarily high and truly persuasive demonstration[s] of actual innocence* that cannot be presented to state authorities . . . ." (Emphasis added; internal quotation marks omitted.) Id., 874 (O'Connor, J., concurring.). They also agreed that the petitioner's affidavits fell far short of this showing. Id.

Justice White, concurring in the judgment, agreed with the assumption that a persuasive showing of actual innocence, although made after the time required by

a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." Id., 862. The court proceeded, however, to consider the merits of the petitioner's claim based on the assumption that a truly persuasive showing of actual innocence would be cognizable in a federal habeas corpus proceeding. It is this latter part of the opinion, and the various concurrences with it, that concern us here.

[20] In that case, the petitioner's claim was not cognizable in the Texas proceedings because Texas law does not permit collateral attack based on newly discovered evidence, and a motion for a new trial based on such evidence was required by Texas law to be made within thirty days of the criminal conviction. *Herrera* v. *Collins,* supra, 113 S. Ct. 864.

law for presentation of newly discovered evidence, would render an execution unconstitutional. Justice White, however, formulated the standard as follows: "To be entitled to relief . . . [the] petitioner would at the very least be required to show that based on proffered newly discovered evidence and the entire record before the jury that convicted him, *no rational trier of fact could [find] proof of guilt beyond a reasonable doubt.*" (Emphasis added; internal quotation marks omitted.) Id., 875 (White, J., concurring.). Justice White also agreed that the petitioner's affidavits fell far short of meeting that standard. Id.[21]

---

[21] Justices Blackmun, Stevens and Souter dissented. They agreed with the majority that the petitioner was required to make a "truly persuasive demonstration of 'actual innocence' " in order to render his execution unconstitutional. *Herrera* v. *Collins,* supra, 113 S. Ct. 882. Their conception of what a "truly persuasive demonstration" should be was, however, different from either the majority or the concurrences: "to obtain relief on a claim of actual innocence, the petitioner must show that *he probably is innocent.*" (Emphasis added.) Id. We reject this standard because it is even less demanding than our standard under a petition for a new trial. Assuming that a showing that the petitioner "probably is innocent" means that, upon a retrial, it is probable that the result would be different, that portion of the standard is equivalent to part of our standard for a petition for a new trial based on newly discovered evidence. It omits, however, our other requirements under that statutory standard. See infra. It would be anomalous to employ a lesser standard under habeas corpus, which has no statute of limitations, than under a petition for a new trial, which has a three year statute of limitations.

Moreover, if we were to assume that this standard is the same as our petition for a new trial standard, for the reasons given in the text we reject it as appropriate for this case. Furthermore, that standard was suggested by the dissenters in the context of that case, in which there was no state procedure by which the petitioner could raise a claim of actual innocence once thirty days had passed from the date of his conviction. That is not the case in our state, in which the petitioner has three years to bring a petition for a new trial. We need not decide, therefore, whether the petitioner's evidence in this case would have been sufficient under a timely petition for a new trial.

The Florida Supreme Court has adopted a somewhat similar standard in a case in which either a life or death sentence has been imposed. In *Jones* v. *State,* 591 So. 2d 911 (Fla. 1991), the court considered the defendant's

The California Supreme Court has articulated a similarly high standard. In *In re Clark,* 5 Cal. 4th 750, 855 P.2d 729, 21 Cal. Rptr. 2d 509 (1993), ruling on a habeas petitioner's claim of, inter alia, actual innocence based on newly discovered evidence; id., 759; the court articulated the following standard: "[W]hether raised in a petition for [a] writ of habeas corpus or by coram nobis, newly discovered evidence is a basis for relief *only if it undermines the prosecution's entire case.* It is not sufficient that the evidence might have weakened the prosecution case or presented a more difficult question for the judge or jury. . . . [A] criminal judgment may be collaterally attacked on the basis of newly discovered evidence *only if the new evidence casts fundamental doubt on the accuracy and reliability of the proceedings* . . . . *[S]uch evidence, if credited, must undermine the entire prosecution case and point unerringly to innocence or reduced culpability.*" (Citations omitted; emphasis added; internal quotation marks omitted.) Id., 766.

Applying these various standards to the petitioner's evidence,[22] we conclude that, under any one of them, Taff's testimony was insufficient to trigger an evalua-

---

motion for postconviction relief under Florida Rules of Criminal Procedure 3.850, based on a claim of newly discovered evidence indicating his innocence in fact.

The court held that, "in order to provide relief, the newly discovered evidence must be of such nature that it would *probably* produce an acquittal on retrial"; (emphasis in original) id., 915; but that the newly discovered facts "must have been unknown by the trial court, by the party, or by counsel at the time of trial, and it must appear that the defendant or his counsel could not have known them by the use of diligence." (Internal quotation marks omitted.) Id., 916. We reject this standard, however, because: (1) it substantially mirrors our petition for new trial standard; and (2) on its face it would not avail the petitioner in this case, since it is clear that Taff's testimony was available to the petitioner at the time of his trial by the exercise of due diligence.

[22] We do not intend by the application of these standards to preclude the possibility of another appropriate standard to such a claim. Another potential standard might be, for example, that a habeas corpus petitioner is required to establish his actual innocence by clear and convincing evidence, a stan-

tion of it by the habeas court for the purpose of determining whether the petitioner had made a showing of actual innocence sufficient to require a new trial. First, contrary to the characterization of Taff's testimony by the Appellate Court, that testimony did not indicate "that the petitioner's conviction was based on a scientific improbability, if not an impossibility." In this respect, we disagree with the Appellate Court's analogy of Taff's testimony to the scientific evidence that we considered in *State* v. *Hammond,* supra, 221 Conn. 264. As we have indicated; see footnote 13; in *Hammond* it was undisputed, based on uncontroverted blood typing and DNA evidence, that it was scientifically impossible for the defendant to have committed the sexual assault in question.

The same cannot be said of Taff's testimony. That testimony amounted to nothing more than a fourth expert opinion derived from an interpretation of the underlying autopsy data that Katsnelson, Gross and Sturner had already interpreted. That is not the kind of evidence that renders prior expert opinions as to the cause of death scientifically impossible or improbable. Indeed, if it were, "[t]he ultimate result would be a never-ending battle of [pathologists] appointed [or retained] as experts for the sole purpose of discrediting a prior [pathologist's] diagnosis." *Silagy* v. *Peters,* 905 F.2d 986, 1013 (7th Cir. 1990), cert. denied, 498 U.S. 1110, 111 S. Ct. 1024, 112 L. Ed. 2d 1106 (1991).[23]

dard higher than a probability but lower than beyond a reasonable doubt and arguably lower than the standards presented in the text. We use the standards presented in the text only because the petitioner has offered no other standard that is appropriate, and because those are the only standards that have been articulated in the available case law thus far.

[23] In *Silagy* v. *Peters,* supra, 905 F.2d 986, on a set of facts remarkably close to this case, the court rejected the habeas corpus petitioner's due process challenge to his state conviction that was based on the submission of the opinion of a newly retained psychiatrist regarding the petitioner's sanity at the time of the offense of which he had been convicted. The new psy-

Second, Taff's interpretation was based on viewing *less* of the underlying autopsy data than the interpretations of the three pathologists who had preceded him. Katsnelson, Gross and Sturner had each examined the victim's hyoid bone and the wet tissue specimens of her laryngeal area. Katsnelson had performed the autopsy and had seen the hyoid bone separation before extracting that bone, as well as the actual crescent shaped mark on her neck. Taff, however, had seen only the photographs of those areas as well as the same slides seen by Sturner. Furthermore, he had formed his opinion without knowing that the petitioner had given inconsistent statements regarding the events in question, that the petitioner had stated that he and the victim had been fighting, and that there had been loud noises emanating from their room that were consistent with a fight between them.

Third, Taff's testimony, while differing in some respects from the testimony of Gross, the defense expert at trial, simply reinforced Gross' testimony in certain other, important respects. Both Gross and Taff: (1) minimized the crescent shaped mark by attributing it to causes other than manual strangulation; (2) opined that the hemorrhages in the victim's eyelid were not petechial; (3) attributed the hemorrhages in the sternocleidomastoid and sternohyoid muscles to causes other than manual strangulation; (4) stated that the separation of the hyoid bone was artifactual; (5) attributed the hemorrhages in the epiglottis area to intubation during resuscitation efforts, rather than to

chiatrist's opinion challenged the opinions of two of the three board certified psychiatrists who had examined the petitioner at the time of his trial. Those two had concluded that he was sane, and the third psychiatrist had concluded that he was not sane. Id., 1013. In rejecting the petitioner's claim that those two psychiatrists had been "incompetent" in their diagnoses, the court stated: "Every aspect of a criminal case which involves the testimony of experts could conceivably be subject to such a review—a never ending process." Id.

manual strangulation; (6) relied in part on the absence of external signs of injury; and (7) gave acute cocaine intoxication as the cause of death. Thus, in large part, Taff's testimony simply repeated, sometimes in the same terms and sometimes in different terms, the testimony of Gross that the petitioner's jury had already rejected as sufficient to raise a reasonable doubt as to his guilt.[24]

By any of the standards for a substantial showing of actual innocence that we have postulated—the most compelling evidence of actual innocence; a truly persuasive demonstration of actual innocence; an extraordinarily high and truly persuasive demonstration of actual innocence; evidence on which no rational trier of fact could find proof of guilt beyond a reasonable doubt; or evidence that casts fundamental doubt on the accuracy and reliability of the original verdict, and that, if credited, undermines the entire prosecution case and points unerringly to innocence[25]—the petitioner's evi-

---

[24] The dissent's assertion that we have "invade[d] the province of the habeas court by finding facts and weighing the evidence" is startling, coming as it does on the heels of the dissent's statement that Taff's "findings and conclusions . . . undermine the state's position that the damage done to the victim's body was caused by manual strangulation." By measuring the facts as found by the habeas court against legal standards, we are performing a traditional function of an appellate court. The dissent's statement, moreover, ignores the undisputed facts that Taff's testimony: (1) was simply a fourth expert opinion derived from the underlying autopsy data already interpreted by Katsnelson, Gross and Sturner; (2) was based on viewing less of the data than those three experts, and did not take into account significant inculpatory evidence adduced at the trial; and (3) simply repeated seven significant aspects of Gross' testimony that the jury had already rejected.

[25] The dissent's insistence that we have adopted any of these standards is unfounded. The dissent substitutes rhetoric for reason.

First, by accusing this court of "continu[ing] its assault on habeas corpus," citing itself in dissent in another case, the dissent in this case implies that we have some intent to destroy or undermine the writ of habeas corpus. We do not.

Second, the dissent states that, despite our specific statements and analyses to the contrary, "it is clear to [him]" that we are setting the stage

dence falls short. It was, therefore, unnecessary for the habeas court to evaluate it for the purpose of determining whether, taken together with and in light of the trial evidence, the writ of habeas corpus should issue on the ground that the petitioner was actually innocent.

The judgment of the Appellate Court is reversed, and the case is remanded to that court with direction to affirm the judgment of the habeas court.

In this opinion, PETERS, C. J., NORCOTT and LAVERY, Js., concurred.

to adopt, and indeed have already embraced, the standard set forth in *Herrera* v. *Collins,* supra, 113 S. Ct. 869. The source of that clarity, however, is a mystery. To the contrary, in this opinion we plainly state that we have not adopted the *Herrera* standard or any of the other standards to which we have referred. Thus, the dissent builds and destroys a straw man rather than addressing the opinion as written.

Also, the dissent's concerns about federalism are exaggerated. Federal courts' concerns about federalism are more closely linked to the question of whether to overturn a state conviction on the basis of federal constitutional violations, than to the setting of the standard for overturning a conviction on the basis of actual innocence. It is true that in *Herrera,* as in any federal habeas corpus case challenging a state conviction, the court was faced with the prospect of overturning a state conviction. It is also true, however, that in *Herrera,* because there was no state proceeding available for the petitioner's claim, the only forum for his claim was in the federal courts. Furthermore, one of the standards we discuss was adopted by the Supreme Court of California for use within that state.

Finally, the dissent substitutes its own nostalgic reading of our habeas corpus jurisprudence for the historical record. As the scholarship in *Carpenter* v. *Meachum,* 229 Conn. 193, 200–201, 640 A.2d 591 (1994), indicates, it cannot be maintained that, in this state, the history of the writ of habeas corpus demonstrates the breadth that the dissent attributes to it. For example, *In re Bion,* 59 Conn. 372, 390–92, 20 A. 662 (1890), limited the writ of habeas corpus to an inquiry into the jurisdiction of the court and the authority of the court to impose the sentence at issue. In *Scott* v. *Spiegel,* 67 Conn. 349, 35 A. 262 (1896), this court determined that in habeas corpus cases at common law, the truth of the jailer's return was not controvertible. Nonetheless, we take it that the dissent agrees with our holding, articulated for the first time in this state, that a claim of actual innocence, without establishing an antecedent constitutional violation, is cognizable in a habeas corpus proceeding.

BERDON, J., dissenting. With today's decision, this court continues its assault on habeas corpus, the Great Writ of liberty.[1] Today's attack takes the form of imposing an impossibly high standard on a petitioner who seeks a new trial based on evidence that he or she is actually innocent of the crime. I believe that, in imposing such a standard, the majority departs dramatically from our established jurisprudence.

Although the majority *purports* to leave the issue of the appropriate standard unresolved because they claim that the petitioner could not meet any acceptable standard,[2] it is clear to me that they are setting the stage

---

[1] The majority claims in footnote 25 of their opinion that they are not attempting to undermine the writ of habeas corpus. The record, however, speaks for itself. See *Carpenter* v. *Meachum,* 229 Conn. 193, 206–207, 640 A.2d 591 (1994) (*Berdon, J.,* dissenting) (discussing several recent cases that have undermined the writ).

It is undisputed that the writ of habeas corpus had a narrower function in the days of the Magna Charta and, indeed, in 1818 when the writ was enshrined in our state constitution. Nevertheless, I hope the majority is not suggesting that we return to the dark ages of our jurisprudence to determine the level of individual rights that should be afforded as we enter the twenty-first century. Connecticut Supreme Court Justice Arthur Healey's words concerning our state constitution are equally applicable to the writ of habeas corpus: "Constitutional provisions must be interpreted within the context of the times. . . . The Connecticut constitution is an instrument of progress, it is intended to stand for a great length of time and should not be interpreted too narrowly or too literally so that it fails to have contemporary effectiveness for all of our citizens." *State* v. *Dukes,* 209 Conn. 98, 115, 547 A.2d 10 (1988).

[2] Of course, by purporting not to adopt any particular standard this court leaves our trial courts without guidance in future cases. More importantly, it could leave a petitioner claiming actual innocence without a remedy. Recently, in *Simms* v. *Warden,* 229 Conn. 178, 640 A.2d 601 (1994), and *Carpenter* v. *Meachum,* 229 Conn. 193, 640 A.2d 591 (1994), this court stripped habeas petitioners of the absolute right to appeal from habeas proceedings via a writ of error. Therefore, a future petitioner whose claim of actual innocence is rejected by the habeas court will not necessarily be able to obtain appellate review of whatever standard was used. If this court is going to deny appellate review as of right to habeas petitioners, we must, at the very least, provide the trial courts with clear standards for evaluating habeas claims.

for adoption of the standard set forth by a majority of the United States Supreme Court in *Herrera* v. *Collins,* U.S. , 113 S. Ct. 853, 122 L. Ed. 2d 203 (1993). Writing for a majority of the court in *Herrera,* Chief Justice Rehnquist indicated that in order to be entitled to relief, a habeas petitioner claiming actual innocence would have to make a "truly persuasive demonstration of 'actual innocence,' " and that "the threshold showing . . . would necessarily be extraordinarily high." Id., 869. Although not fully defined, the standard suggested by Chief Justice Rehnquist and embraced by the majority in this case implies that an absolute certainty of innocence is required.

This standard is simply absurd. If a petitioner could provide evidence so overwhelming that no rational person could continue to believe that he or she were guilty of the crime, then a new trial would not even be necessary. Furthermore, such a standard is inappropriate for state habeas proceedings. As Chief Justice Rehnquist explained in *Herrera,* in determining the appropriate scope of federal habeas review, the federal courts are limited by federalism concerns and by the traditional deference paid to the states in matters of criminal process. Id., 860–61, 864. Therefore, a claim of actual innocence based on newly discovered evidence is not a ground for federal habeas relief "absent an independent constitutional violation occurring in the underlying state criminal proceeding"; id., 860; because *"[f]ederal* courts are not forums in which to relitigate *state* trials." (Emphasis added; internal quotation marks omitted.) Id., 861. According to Chief Justice Rehnquist, the federal courts do not have jurisdiction to grant habeas relief for a claim of actual innocence unless the evidence of innocence is so overwhelming that it would be unconstitutional not to grant the petitioner a new trial. Id., 869. State courts face no such limitation.

Although a majority of the United States Supreme Court has adopted strict standards for habeas review that demean our federal charter of liberty, state courts need not and should not go down this same path. This court clearly is not limited by federalism concerns in considering the scope of review that should be afforded to petitioners who have been convicted in our own state courts. Indeed, the applicable statute commands that habeas cases must be disposed of "as law and justice require." General Statutes § 52-470 (a). The impossibly high standard suggested by the *Herrera* majority for federal habeas review of state court convictions is inconsistent with the statutory mandate that justice be done.

I recognize that the issuance of a writ of habeas corpus carries with it certain costs. I agree with the majority that it can undermine the societal interest in the finality of judgments, and can make it difficult to retry a person because of the passage of time. A democratic society such as ours, however, has an important interest in assuring that innocent persons are not put to death or deprived of their liberty. That assurance is, quite simply, what the writ of habeas corpus is all about. The Great Writ "cuts through all forms and goes to the very tissue of the structure. It comes in from the outside, not in subordination to the proceedings, and although every form may have been preserved opens the inquiry whether they have been more than an empty shell." *Frank* v. *Mangum,* 237 U.S. 309, 346, 35 S. Ct. 582, 59 L. Ed. 969 (1915) (Holmes, J., dissenting). In *Bunkley* v. *Commissioner of Correction,* 222 Conn. 444, 460–61, 610 A.2d 598 (1992), this court held that the writ "is to serve as a bulwark against convictions that violate fundamental fairness" or involve a "miscarriage of justice." (Internal quotation marks omitted.) Today's decision reduces this great bulwark to a sieve.

I believe that, when considering a petitioner's claim that he or she is actually innocent based on evidence not offered at trial, the standard suggested by Justice Blackmun (joined by Justices Stevens and Souter) in *Herrera* charts a course that both protects society's interests and is consistent with the purpose of habeas corpus. "I think the standard for relief on the merits of an actual-innocence claim must be higher than the threshold standard for merely reaching that claim or any other claim that has been procedurally defaulted or is successive or abusive. I would hold that, to obtain relief on a claim of actual innocence, the *petitioner must show that he probably is innocent.*" (Emphasis added.) *Herrera* v. *Collins,* supra, 113 S. Ct. 882 (Blackmun, J., dissenting); see also *Jones* v. *State,* 591 So. 2d 911, 915 (Fla. 1991) (habeas petitioner entitled to relief if new evidence would probably produce an acquittal on retrial); H. Friendly, "Is Innocence Irrelevant? Collateral Attack on Criminal Judgments," 38 U. Chi. L. Rev. 142, 160 (1970) (habeas petitioner should be required to "show a fair probability that, in light of all the evidence, including . . . evidence tenably claimed . . . to have become available only after the trial, the trier of the facts would have entertained a reasonable doubt of his guilt"). The majority of this court, in rejecting this standard, denies new trials to petitioners who are "probably innocent."

In considering a petitioner's request for a new trial, we have always used the standard that there must be a reasonable probability that he or she would be acquitted if retried. See *Bunkley* v. *Commissioner of Correction,* supra, 222 Conn. 457, 465. The majority distinguishes *Bunkley* because the petition in that case was based on a claim of ineffective assistance of counsel. Nevertheless, if a petitioner is successful on the claim of ineffective assistance of counsel, it results in a new trial. Retrying such a case poses the same "stale

evidence'' problems to the state that a new trial based on a claim of actual innocence would involve. Furthermore, the majority claims that the "reasonable probability" claim was appropriate in *Bunkley* but not in the present case because in *Bunkley*, the ineffectiveness of counsel constituted "a breakdown of the traditional adversarial process on which we rely to produce just results."[3] If, however, a probably innocent person has been convicted, then there has been a breakdown of the adversarial process, regardless of whether there exists a specific constitutional violation to blame for the breakdown.

Similarly, the majority rejects the standard applied in reviewing a petition for a new trial based on newly discovered evidence—i.e., "whether it is probable that on a new trial a different result would be reached." *Taborsky* v. *State,* 142 Conn. 619, 623, 116 A.2d 433 (1955). The majority claims that it would be inappropriate to "transplant" this standard "to a habeas corpus petition based on a claim of actual innocence" because the petition for a new trial must be brought within three years after the judgment, whereas a habeas petition may be brought at any time. Thus, they conclude, "[t]he petitioner who thinks that there is newly discovered evidence sufficient to overturn his verdict would have *no incentive* to bring that evidence before the court within the three year limitations period . . . ." (Emphasis added.) This argument ignores the fact that

---

[3] The majority's refusal to adopt the *Bunkley* standard based on this distinction is inconsistent with its holding that a habeas petitioner's claim of actual innocence is cognizable in the absence of an antecedent constitutional violation that affected the fairness of the trial. The majority uses the lack of an antecedent constitutional violation to raise the standard from *Bunkley's* reasonable probability of acquittal on retrial to *Herrera's* absolute certainty of innocence. This is tantamount to requiring an antecedent constitutional violation as a prerequisite to habeas review of an actual innocence claim.

the petitioner is in jail, and therefore has a strong incentive to bring the evidence of his or her probable innocence before the court as quickly as possible.

Even if this court rejects the "probably innocent" standard for a new trial, we should, at the very least, order a new hearing. As the Appellate Court pointed out, the habeas court failed to consider the petitioner's actual innocence claim under any standard because it believed that a new trial based on sufficiency of the evidence was not available in a habeas proceeding.[4] *Summerville* v. *Warden,* 29 Conn. App. 162, 177, 614 A.2d 842 (1992).

Furthermore, I believe that under any standard—whether it requires a showing of probable innocence or a truly persuasive demonstration of actual innocence—the petitioner in all probability would be entitled to a new trial. I agree with the Appellate Court that "[t]he additional evidence brought forth by the petitioner, if found to be such that a jury might reasonably credit, indicates that the petitioner's conviction was based on a scientific improbability, if not an impossibility." *Summerville* v. *Warden,* supra, 29 Conn. App. 179. The findings and conclusions of Mark Taff, a forensic pathologist, undermine the state's position that the damage done to the victim's body was caused by manual strangulation. Furthermore, his findings hurt the credibility of the state's witness. For example, Taff testified at the habeas hearing that the hemorrhages found in the victim's left eye could not have been caused by strangulation, because strangulation would have caused hemorrhaging in both eyes and no hemorrhages were found in the right eye. He also testified that the absence of hemorrhaging in the area of the hyoid bone means

---

[4] The trial court stated in its memorandum of decision that it "is not for a habeas court to . . . 'inquire into the sufficiency of the evidence' " to determine whether a new trial is warranted.

that it could not have been broken before death as a result of strangulation. Nevertheless, the majority invades the province of the habeas court by finding facts and weighing the evidence, and concluding as a matter of law that the proffered evidence is insufficient to satisfy its standardless standard for granting a new trial.

When the liberty or life of a person is at stake, the Great Writ must be given adequate breathing room so that justice may be done. In advocating a relaxation of the requirements for habeas review of a claim that has been procedurally defaulted at trial or on direct appeal, Connecticut Supreme Court Justice David Shea wrote the following: "[P]rinciples of comity and finality . . . must yield to the imperative of correcting a fundamentally unjust incarceration. Accordingly . . . where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default. . . . This court in exercising its habeas corpus jurisdiction should do no less. The very nature of the writ demands that it be administered with the initiative and flexibility to insure that miscarriages of justice within its reach are surfaced and corrected. . . . *Courts ought not to suffocate the writ in stifling formalisms or hobble its effectiveness with the manacles of arcane and scholastic procedural requirements.*" (Citations omitted; emphasis added; internal quotation marks omitted.) *Valeriano* v. *Bronson*, 209 Conn. 75, 97, 546 A.2d 1380 (1988) (*Shea, J.*, concurring).

I respectfully dissent.