## LEONARD TALTON *v.* COMMISSIONER OF CORRECTION*

Superior Court, Judicial District of Tolland
File No. CV-99-0002923

Memorandum filed February 27, 2003

*Sebastian O. DeSantis,* for the petitioner.

*Linda N. Howe,* assistant state's attorney, for the respondent.

FUGER, J. The petitioner, Leonard Talton, alleges in his petition for a writ of habeas corpus, initially filed on April 8, 1999, and amended on May 3, 1999, September 7, 2001, and for a final time on March 15, 2002, that his 1998 conviction of one count of murder in violation of General Statutes § 53a-54a, one count of conspiracy to commit murder in violation of General Statutes §§ 53a-54a and 53a-48 (a), two counts of criminal possession of a firearm in violation of General Statutes § 53a-217 (a) and (c), respectively, and one count of carrying a pistol without a permit in violation of General Statutes § 29-35 and commission of a felony with a firearm in violation of General Statutes § 53-202k was obtained in violation of the sixth and fourteenth amendments to

---

* Affirmed. *Talton* v. *Commissioner of Correction,* 84 Conn. App. 608, 854 A.2d 764 (2004).

the United States constitution and article first, § 8, of the state constitution. He claims to have been denied effective representation by his trial counsel.

This matter came before this court on November 18, 2002, January 13, 2003, and again on February 24, 2003, at which time testimony was received from the petitioner, his trial counsel, attorney Lawrence Hopkins, Patricia Snowden (the petitioner's mother), Leonard Talton, Sr. (the petitioner's father), Richard Snowden (the petitioner's brother and codefendant), Arthur Moore, attorney Thomas Farver (an expert witness on criminal trial defense matters), and Detectives Leroy Dease and Edwin Rodriquez of the New Haven police department. Numerous pieces of documentary evidence were also received, including, inter alia, the transcript of the petitioner's trial on the underlying matter. For the reasons set forth more fully, the petitioner has failed to meet his burden of proof, and the petition shall be denied.

As regards the claim of ineffective assistance of trial counsel, the petitioner alleges that trial counsel failed to advise the petitioner adequately concerning options regarding defenses, to investigate the legal issues adequately, to investigate potential defenses, to investigate elements of the prosecution's proof, to cross-examine a witness effectively, to object to an alleged violation of the trial court's sequestration order by the victim's sister, to investigate elements of the defense case adequately and to investigate witnesses adequately who might be available to support potential defenses. In addition, the petitioner alleges that trial counsel failed to object to an incident in which the trial judge was reportedly observed entering the jury deliberation room during the jury deliberations.

I

## FINDINGS OF FACT

The court has reviewed all of the testimony and evidence and makes the following findings of fact. Further facts will be related as necessary to resolve specific claims. The petitioner was the defendant in a case in the judicial district of New Haven at New Haven, under Docket No. CR97-0446889 entitled *State* v. *Talton*. The petitioner was charged with one count of murder in violation of § 53a-54a, one count of conspiracy to commit murder in violation of §§ 53a-54a and 53a-48 (a), two counts of criminal possession of a firearm in violation of § 53a-217 (a) and (c), respectively, one count of carrying a pistol without a permit in violation of § 29-35 and with commission of a felony with a firearm in violation of § 53-202k.

The petitioner initially decided to represent himself with the assistance of standby counsel. The petitioner's trial counsel, attorney Hopkins, was appointed standby counsel by the court on September 15, 1998. The petitioner changed his mind, and on October 6, 1998, asked the court, *Fracasse, J.*, to appoint attorney Hopkins as the trial counsel. The motion was granted. Trial in the case commenced on November 9, 1998. The petitioner was found guilty by the jury on all counts on November 13, 1998.

As for the facts of the underlying offenses, the jury could have reasonably found that "[o]n March 22, 1997, at approximately 8:30 p.m., a shooting occurred at the Quinnipiac Terrace Housing Complex (housing complex) in New Haven. As a result, the victim, Tyrone Belton, died after receiving a single gunshot wound to the chest. A friend of the victim, Tacumah Grear, witnessed the shooting and the events that had led to the shooting. The shooting arose from a dispute involving a motorbike that had occurred on the day before the

shooting. On the morning of March 21, 1997, the victim and Grear were taking turns riding the victim's motorbike at the housing complex. While the victim was passing the motorbike to Grear, Richard Snowden, the [petitioner's] brother, approached them and asked if he could also ride the motorbike. The victim responded in the negative. Nevertheless, Snowden took the motorbike and rode off on it. When Snowden returned with the motorbike, the victim punched Snowden in the face, knocking him unconscious. Snowden subsequently reported the incident to his friend, Sean Bethea. Later that day, Bethea confronted the victim about the incident and the two engaged in a fistfight. After the fight, the parties discussed the matter, and the victim was under the impression that they had resolved the dispute involving the motorbike. The victim's impression, however, would prove to be wrong. On the following evening, the victim and Grear were standing in a parking lot located in the housing complex. While waiting there, two men approached them; one was wearing a camouflage mask, and the other was wearing a hood pulled tightly over his head. Despite their disguises, Grear recognized the two men as the [petitioner] and Snowden because he had known both of them before the night in question. One of the assailants told Grear to leave so that he could 'handle [his] business.' Grear understood that to mean that the assailants wanted to shoot the victim. Grear stepped between the assailants and the victim, and told them that he would not leave. A struggle ensued during which the hooded man, the [petitioner], brandished a gun and prepared to fire it. The victim saw the gun and, in response, pushed Grear to the ground to prevent him from being shot. After falling to the ground, Grear saw the hooded man point the gun at the victim and fire it. The victim fell to the ground, and the assailants fled the scene." *State* v. *Talton*, 63 Conn. App. 851, 853–54,

779 A.2d 166, cert. denied, 258 Conn. 907, 782 A.2d 1250 (2001).

The Appellate Court affirmed the petitioner's conviction on direct appeal. Id., 853.

## II

## DISCUSSION OF LAW

It is important at the outset to understand a critical difference between the legal status of a person who has been accused of a crime as opposed to one who has been convicted of a crime. Although the person who has been accused of a crime is entitled to a presumption of his or her innocence, the petitioner in a habeas corpus petition, having already been convicted, is not. "It is undoubtedly true that [a] person when first charged with a crime is entitled to a presumption of innocence, and may insist that his guilt be established beyond a reasonable doubt. *In re Winship*, 397 U.S. [358], 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). *Herrera* v. *Collins*, 506 U.S. 390, 398, [113 S. Ct. 853, 122] L. Ed. 2d 203 (1993). . . . The presumption of innocence, however, does not outlast the judgment of conviction at trial. . . . Thus, in the eyes of the law, [the] petitioner does not come before the Court as one who is innocent, [but, on the contrary, as] one who has been convicted by due process of law . . . ." (Citations omitted; internal quotation marks omitted.) *Summerville* v. *Warden*, 229 Conn. 397, 422–23, 641 A.2d 1356 (1994).

In considering the alleged deficient performance of the petitioner's trial counsel, the claim of ineffective assistance of counsel must satisfy both prongs of the test set forth by the United States Supreme Court in *Strickland* v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), before the habeas court can grant relief. Specifically, the petitioner must first show "that counsel's performance was deficient. This

requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. If, and only if, the petitioner manages to get over the first hurdle, then the petitioner must clear the second obstacle by proving "that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." Id. In short, the petitioner must show both deficiency and prejudice. A failure to prove both, even though a counsel's trial performance may have been substandard, will result in denial of the petition.

It is a critical fact to understand that trial in this court of a habeas petition is not an opportunity for a new counsel to attempt to relitigate a case in a different manner. It is an indisputable fact that many times, if one had foreknowledge of certain events, different courses might well have been taken. Likewise, a habeas court knowing the outcome of the trial "may not indulge in hindsight to reconstruct the circumstances surrounding the challenged conduct, but must evaluate the acts or omissions from trial counsel's perspective at the time of the trial." *Beasley* v. *Commissioner of Correction*, 47 Conn. App. 253, 264, 704 A.2d 807 (1997), cert. denied, 243 Conn. 967, 707 A.2d 1268 (1998). "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance

. . . ." (Internal quotation marks omitted.) *Henry* v. *Commissioner of Correction*, 60 Conn. App. 313, 317, 759 A.2d 118 (2000).

In other words, it is not the business of the habeas court to serve as a Monday morning quarterback and to pick apart critically every tactical decision made by trial counsel. By the time the case reaches this court on a petition for a writ of habeas corpus, it is self-evident that the strategy that was actually adopted by trial counsel was unsuccessful. Had it been successful, the petitioner would have been acquitted and never would have filed the petition in the first place. So, the question then is whether trial counsel made a reasonable tactical decision in light of all of the circumstances.[1] If so, even though there may have been another tack to use, the assistance of trial counsel will be found to be effective.

Furthermore, it is not necessary to consider whether trial counsel's performance was deficient if the habeas court is satisfied that there was no prejudice to the petitioner by the actions of trial counsel in representing the petitioner. "A reviewing court can find against a petitioner on either ground, whichever is easier. *Strickland* v. *Washington*, supra, [466 U.S. 697]; see *Nardini* v. *Manson*, 207 Conn. 118, 124, 540 A.2d 69 (1988) ([a] court deciding an ineffective assistance of counsel claim need not address the question of counsel's performance, if it is easier to dispose of the claim on the ground of insufficient prejudice) . . . ." (Citation omitted; internal quotation marks omitted.) *Valeriano* v. *Bronson*, 209 Conn. 75, 86, 546 A.2d 1380 (1988).

---

[1] "Two roads diverged in a yellow wood, And sorry I could not travel both . . . ." R. Frost, "The Road Not Taken" in Collected Poems of Robert Frost (Buccaneer Books, Inc., 1986 Ed.) p. 131. Sometimes, like Robert Frost's unnamed traveler, trial counsel is confronted with two alternative defenses and must make a tactical decision as to which is the best defense to use. It is not for the court to second-guess otherwise sound tactical decisions.

In this case, it is clear that the petitioner's trial counsel did a satisfactory job of representing the petitioner. The thrust of the petitioner's complaint is that trial counsel did not present the alibi defense that the petitioner thought would have been successful. It is clear that the decision as to which defense to present is a tactical decision that rests primarily within the expertise of the attorney who is representing the petitioner. Here, attorney Hopkins was faced with the choice of presenting the alibi defense and totally denying that his client was involved in the shooting whatsoever or deciding to forgo the formal alibi defense, and attempting to show the inconsistencies in the state's case and to argue that the state failed in its burden to show the petitioner's guilt. He chose the latter path. In addition, attorney Hopkins raised the possibility that the fatal shot was accidentally fired, thereby giving the jury an opportunity to believe that the petitioner was at the scene, but still to acquit him of the murder. In order to resolve this case, it is necessary to evaluate the potential alibi defense.

A failed alibi defense can be catastrophic for the defense. With an alibi defense, the defendant in a criminal trial more or less concedes that a crime has been committed, but says that it was committed by someone else. As always, the burden to disprove the alibi lies with the prosecution, but the defendant must raise the issue. Attorney Hopkins astutely offered the observation that a good alibi defense will, more often than not, work to prevent the trial in the first place. Unfortunately, while the petitioner may have had the semblance of an alibi defense, it could hardly be called a good one. In fact, had the alibi defense been presented to the jury, it is most likely that the jury would have found it to be incredible. That would have clearly undermined the strategy that trial counsel was attempting to put forth. In retrospect, it is hard to see how the petitioner

would have been any worse off for having presented the alibi defense because he was found guilty of all of the charges anyway. Attorney Hopkins, of course, did not have the benefit of knowing the outcome of the trial when he made the tactical decision to forgo a formal alibi defense.

In essence, the petitioner asserts that on March 22, 1997, the night that the victim was killed, he was at his mother's home a few blocks away from the crime scene. He stated that he arrived at her home about 4 p.m. and remained there until approximately 9 p.m. The murder took place somewhere around 8:30 p.m.[2] At the habeas trial, Patricia Snowden testified that the petitioner was at her home during those hours. Likewise, Richard Snowden told the same story and confirmed that both he and the petitioner were in his mother's house for the entire time between 4 p.m. and 9 p.m. If that testimony were true, then it would constitute a viable alibi defense and would exonerate the petitioner. There were some prior statements given to the police, however, that seriously undermined that testimony.

The initial police investigation showed that the petitioner and his brother, Richard Snowden, were prime suspects in the shooting. Consequently, the police sought interviews with both men, and both provided statements to the police. Their stories were similar except in one key respect. Both men reported having been at Patricia Snowden's home between 4 p.m. and 9 p.m. with the exception of a trip to a liquor store that took place between 7 p.m. and 8 p.m. The petitioner stated that they went to one liquor store, but his brother gave the name of a different liquor store. The police

[2] The exact time of the shooting is unclear, although the police report indicates that the emergency call notifying them of the incident was received at 8:49 p.m. It is logical to presume, therefore, that the actual shooting took place shortly before that.

officers also spoke with Patricia Snowden, who confirmed that the two men did leave her house, although she stated that they returned shortly after 9 p.m. In addition, Richard Snowden is reported by the police to have admitted being present at the time of the shooting. The petitioner, Richard Snowden and Patricia Snowden all denied in their testimony at the habeas trial that they had ever made those statements to the police.

In determining whether to pursue the alibi defense, attorney Hopkins was confronted with the fact that his client's alibi was defective. First, all of the witnesses who could corroborate the alibi were family members of the petitioner. Second, one of the alibi witnesses, Richard Snowden, was himself on trial for the murder.[3] Third, all of the alibi witnesses had made prior inconsistent statements that would have severely affected the credibility of the potential trial testimony establishing an alibi. Had the alibi defense been presented to the jury, there was a strong likelihood that the jury would have concluded that the witnesses were lying.

In lieu of a formal alibi defense, attorney Hopkins used the defense case to poke holes in the state's case. In fact, he called the jury's attention to the paucity of proof regarding who did the shooting.[4] In that way, he planted the question of the petitioner's whereabouts on the night of the murder in the minds of the jury in such a way that he did not have to use the risky formal alibi evidence. Given the recantation of the state's eyewitness to the shooting, Grear, that was a wise tactical move.

[3] Richard Snowden pleaded guilty to conspiracy to commit murder and was sentenced to ten years imprisonment. The record before this court is unclear as to whether that plea was made before or after the petitioner's trial. If it was before the petitioner went to trial, then that would further undermine the credibility of Richard Snowden's alibi testimony.

[4] In closing argument, attorney Hopkins stated: "We proffer that [the petitioner] was not at the scene at the time the gunshots were fired and that the state has in no way, shape or form met its burden of proof beyond a reasonable doubt that he was."

The issue of recantation of testimony is another area relative to which the petitioner alleges that trial counsel was ineffective. Although Grear did testify at the trial that it was not the petitioner who did the shooting, he had made a previously sworn statement to the police that clearly and expressly inculpated the petitioner. That statement was admitted into evidence and accepted as substantive evidence under the authority of *State* v. *Whelan*, 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986). At the habeas trial, the petitioner presented the testimony of Moore, who testified that he saw a "light-skinned black man" do the shooting and that because the petitioner was much darker, it was not him. Moore also had given a statement to the police that clearly and expressly identified the petitioner as the person who shot the victim. At the habeas trial, Moore testified that he had been paid $110 by the police and was forced to make his tape-recorded statement, which was false. Attorney Hopkins did not call Moore at the petitioner's trial. His reasoning was that even if Moore testified that he could not identify the shooter, the state would have been able to admit his detailed statement to the police as substantive evidence under *Whelan*. Attorney Hopkins decided that because one such statement, Grear's, already had been admitted into evidence, another would be detrimental to his client's case. Consequently, attorney Hopkins made another wise tactical decision not to call Moore as a witness.

There was an allegation that the trial judge entered the jury deliberation room during deliberations. There is some inconsistency in the proof of that allegation, however. The sole witness who reported that it happened was the petitioner's father. He was a bit vague as to when that event occurred. There was no supporting testimony from the trial judge or any of the jurors that the judge had gone into the deliberation room. There

was no testimony of a sheriff being placed at the door of the jury room, as is normally the case in jury deliberations. There is no proof as to whether there were any jurors inside at the time, even assuming the judge had entered the room. Attorney Hopkins was not aware of that event having occurred and testified that he would have brought it to the judge's attention if he had been told that it happened. Consequently, this court is not convinced that the trial judge entered the room at all. That being the case, that allegation is dismissed as a basis on which to grant the habeas petition.

All other allegations are similarly without basis. As far as any violation of a sequestration order, the petitioner has failed to convince the court that there was a violation, much less demonstrate that any prejudice resulted therefrom. Attorney Hopkins did a good job in defending the petitioner and was an effective trial counsel. Although the petitioner is understandably upset at the outcome of the trial, his rights under the United States and Connecticut constitutions were not abridged in any way.

Accordingly, the petition for a writ of habeas corpus is denied.